No. 79,531

MARVIN BERGSTROM; MARILYN BERGSTROM; BEN DREESEN; KAREN DRESSEN; and FARMERS LIVESTOCK COMMISSION CO., INC., a Kansas Corporation, *Plaintiffs*, v. DON W. NOAH and NOAH & HARRISON, P.A., *Defendants/Appellees*, LYLE J. KOENIG, *Defendant*, ROGER MCCARTNEY, d/b/a STOCKMAN'S LIVESTOCK EXCHANGE, *Defendant/Appellant*, and CHARLENE MCCARTNEY, *Defendant*.

(974 P.2d 531)

Opinion filed March 5, 1999.

*Bert S. Braud*, of The Popham Law Firm, P.C., of Kansas City, Missouri, argued the cause and was on the briefs for appellant.

*Justice B. King*, of Fisher, Patterson, Sayler, & Smith, L.L.P., of Topeka, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

DAVIS, J.: Roger McCartney, d/b/a Stockman's Livestock Exchange and Charlene McCartney, (the McCartneys) through their attorneys, Don W. Noah and Noah and Harrison, P.A., (Noah), filed a Kansas antitrust action against Marvin and Marilyn Bergstrom, Ben and Karen Dreesen, and Farmers Livestock Commission Co., Inc., (the FLCC parties) in the District Court of Republic County, Kansas. This underlying antitrust action was resolved by summary judgment against the McCartneys. The FLCC parties then filed a malicious prosecution action against the McCartneys and Noah, which was resolved by summary judgment against the FLCC parties and affirmed by this court in *Bergstrom v. Noah*, 266 Kan. 829, 974 P.2d 520 (1999). The subject of this

appeal involves a cross-claim in the malicious prosecution action filed by the McCartneys against Noah for legal malpractice in bringing the underlying antitrust action. The district court granted summary judgment to Noah. We affirm.

In its summary judgment in this case, the trial court identified by reference the uncontroverted facts upon which it based its conclusions of law. Those facts relate to both the malicious prosecution action and this malpractice action. However, because all of the facts are identified by the trial court in its grant of summary judgment in this action, they are set forth in full:

"1. Plaintiffs in the present case assert that Don W. Noah and Noah & Harrison, P.A., maliciously prosecuted claims against them on behalf of Roger McCartney in the case styled *Roger McCartney d/b/a/ Stockman's Livestock Exchange and Charlene McCartney v. Farmers Livestock Commission Co., Inc., Marvin Bergstrom, Marilyn Bergstrom, Ben Dreesen, and Karen Dreesen*, Case No. 92-C-04, filed in Republic County, Kansas (hereinafter referred to as the 'underlying litigation'), a true and correct copy of the Petition filed in the underlying litigation against plaintiffs (hereinafter collectively referred to as the FLCC parties). . . .

"2. The following pleadings were filed, and rulings were made, with regard to dispositive motions in the underlying litigation:

(a) The FLCC parties served a Motion to Dismiss on or about May 7, 1992, and Dr. McCartney responded to that motion on or about June 29, 1992. . . .

(b) The District Court denied the FLCC parties' Motion to Dismiss on July 6, 1992. . . .

(c) The FLCC parties filed a Motion for Interlocutory Appeal on or about July 21, 1992. That Motion for Interlocutory Appeal stated in pertinent part that:

'2. . . . Specifically, Defendants contended that Plaintiff had failed to allege an antitrust conspiracy or combination under applicable law. On July 13, 1992, the Court filed an order denying Defendants' Motion.

'3. . . . (1) The order involved a controlling question of law as to which there is substantial ground for difference of opinion; . . .

. . . Has Plaintiff alleged or is he able to show an antitrust conspiracy or combination? Furthermore, there is substantial ground for difference of opinion because this question has not been directly addressed by the Kansas appellate courts. This question requires a determination of how a conspiracy must be [pled], as well as what conduct constitutes an antitrust conspiracy. . . .'
. . . .

(d) The Motion for Interlocutory Appeal was denied by the District Court on September 3, 1992. . . .

(e) The FLCC parties filed a Memorandum Brief In Support of Defendants' Motion for Summary Judgment on or about July 26, 1993. . . .

(f) A response to the FLCC parties Motion for Summary Judgment was filed on August 19, 1993. . . .

(g) The FLCC parties filed a reply to Dr. McCartney's response to Motion for Summary Judgment on or about August 25, 1993. . . .

(h) The District Court initially denied FLCC parties' Motion for Summary Judgment on August 23, 1993. . . .

(i) On or about August 25, 1993, the FLCC parties filed a Motion for Reconsideration of the District Court's denial of Summary Judgment. . . .

(j) Summary Judgment was granted by the District Court to the FLCC parties on August 31, 1993 in response to the Motion for Reconsideration filed by the FLCC parties. . . .

(k) A Motion to Alter and Amend was thereafter filed on behalf of Dr. McCartney on September 30, 1993. . . .

(l) Dr. McCartney's Motion to Alter and Amend was denied on November 9, 1993. . . .

(m) The District Court's Order of Summary Judgment was thereafter appealed on behalf of Dr. McCartney, and the decision of the District Court was upheld on appeal. . . .

"3. At the time the underlying litigation was filed, Dr. McCartney was the owner of Stockman's Livestock Exchange sale barn in Belleville, Kansas, and he remains the owner of the sale barn. . . .

"4. The FLCC parties are all involved in the ownership, and operation, of the Farmers Livestock sale barn in Washington, Kansas, and have been involved in such ownership, and operation of the sale barn since 1984. . . .

"5. The livestock auction barn located at Washington, Kansas, was closed from 1982 until it was opened by FLCC on November 18, 1984. . . .

"6. Prior to the FLCC parties becoming involved with the FLCC sale barn in 1984, the sale barn had been through hard financial times, and, in fact, was acquired by the Bergstroms and Dreesens from a trustee in bankruptcy. . . .

"7. Mr. and Mrs. Bergstrom and Mr. and Mrs. Dreesen first became involved in the sale barn business together when they entered into an agreement to purchase the FLCC sale barn at a bankruptcy sale. . . .

"8. When the Bergstroms and Dreesens entered into the agreement to purchase the FLCC sale barn each couple agreed to pay half of the price, and did pay half the price each. The total purchase price was approximately $12,000. . . .

"9. Dr. McCartney purchased Stockman's Livestock Exchange in 1985 for the sum of Three Hundred Thousand Dollars ($300,000.00). . . .

"10. Over the next few years the number of livestock being sold through Dr. McCartney's sale barn decreased. . . .

. . . .

"14. The value of a sale barn is determined by the number of livestock going through it. . . .

"15. In 1986 Dr. McCartney obtained information leading him to believe that trucking was being provided to farmers by FLCC through C & C Truckline op-

erated by Adolph Charbonneau, and was being paid for by one or more of the FLCC parties, not by the farmers. . . .

"16. Specifically, in 1986, Dr. McCartney became concerned about an incident where he had made arrangements with a consignor Eric Anderson, to sell cattle at Stockman's Livestock. A call was then made to C & C Truckline to haul the cattle, and thereafter Dr. McCartney was told by the farmer that he had been contacted by Mr. Bergstrom, and had determined, without further explanation, to take the cattle to Farmers Livestock, instead of Stockman's Livestock, for sale. Thereafter, Dr. McCartney confronted Ben Dreesen concerning this incident, and Mr. Dreesen denied that any rules or laws had been violated. . . .

"17. When payments of trucking are made by a sale barn on a discriminatory basis, in other words, paid to some customers, and not others, it is considered by the Packers and Stockyards Administration to be a violation of the Packers & Stockyards Act. . . .

"18. Payment of free or reduced price trucking is an effective way to attract customers to a sale' barn who would not otherwise go to that particular sale barn. . . .

"19. If free or reduced cost trucking is offered for large groups of cattle, it brings more cattle to a sale barn, and as a consequence brings even more customers to the sale barn in anticipation of better bidding at the sale barn. . . .

"20. Prior to filing suit in this matter, Dr. McCartney was concerned that he was losing significant sale barn business to the FLCC sale barn as a result of the FLCC parties providing free and below-cost trucking. Dr. McCartney discussed these concerns with other sale barn operators in the area, and they concurred in his belief that FLCC was offering free or below-cost trucking to attract business to the FLCC sale barn. . . .

. . . .

"23. The FLCC parties were first warned by the Packers and Stockyards Administration in 1985, just shortly after they began operating the FLCC barn, that they were violating the law by offering free or below-cost trucking to farmers. This warning specifically advised the FLCC parties of the illegality of the practice, and further advised the FLCC parties that each violation would result in a Cease and Desist Order and fine up to $10,000. Specifically, the Packers and Stockyards Administration's letter of March 25, 1985, directed to Marvin Bergstrom as President of FLCC stated that:

'This is to confirm that our conversation regarding the practice of providing free or below-cost trucking of consignors' livestock to your market. As you were advised, this is considered an unfair practice in violation of Section 312(a) of the Packers and Stockyards Act, found on page 15 of the enclosed. Please see that such violation may result in Cease and Desist Order and fine up to $10,000 for each such violation.

'In our conversation, you admit providing some free trucking, but you did not realize it is against P&S regulations. You agreed to immediately discontinue

this practice and ask that we contact some of your competitor auctions to stop them from similar violations.'

. . . .

"24. In 1988 a further investigation was done by the Packers and Stockyards Administration of FLCC at Dr. McCartney's request, but no evidence of further violations was discovered at that time. . . .

"25. Packers and Stockyards Administration representatives themselves, however, later acknowledged that their 1988 investigation was inadequate, and in 1991, at the request of Dr. McCartney, Packers and Stockyards Administration re-instituted an investigation of FLCC. . . .

"26. In connection with the 1991 investigation, Dr. McCartney supplied lists of farmers to Packers and Stockyards Administration investigators indicating that those people had possibly had their trucking paid or received part of their commission back or both from FLCC. . . .

"27. From this list of 40 farmers, three commercial truckers and four farmer truckers provided to them by Dr. McCartney, the Packers and Stockyards Administration's 1991 report reflects that Packers and Stockyards Administration investigators did random interviews of six farmers in 1991, and of the six, Packers and Stockyards Administration investigators definitively confirmed the payment of trucking to one, namely, Mr. Dean Anderson who admitted such payment. . . .

"28. The 1991 investigation by Packers and Stockyards Administration documented an incident reflecting payment of trucking for Dean Anderson by the FLCC parties. In pertinent part, Dean Anderson informed Packers and Stockyards Administration investigators that:

'During the interview, ANDERSON stated that in recent years he has been selling his calves at FARMERS. BERGSTROM always comes and looks at the cattle before ANDERSON consigns them. ANDERSON said that BERGSTROM usually sets up the trucking for the cattle through C&C TRUCK LINE, INC., Concordia, KS. ANDERSON said that part of the time C&C bills him directly, and other times BERGSTROM pays for the trucking. HEBENSTRIET asked if BERGSTROM pays for the trucking to get ANDERSON to use his market. ANDERSON replied "Yes." '

. . . .

"29. At least two consignments of livestock were made to Stockman's Livestock, but when these consignors called C & C to haul their stock the consignments did not come to Stockman's but went to FLCC. These consignors were Dorman Brothers and Eric Anderson. . . .

"30. About 40% of C & C's business was Bergstrom Livestock and probably less than 1% is FLCC. . . .

"31. According to his deposition in the underlying litigation, if C & C Truckline has trucks available, Marvin Bergstrom uses that truckline. . . .

"32. The 1991 investigation also reflected that although another farmer, Francis Baxa, indicated that FLCC normally deducted his trucking costs from his sale proceeds, in the particular incident investigated, no trucking charge had been

deducted. When asked whether he had received free trucking Mr. Baxa did not deny it, but rather asked 'Is free trucking illegal?' . . .

"33. As a result of its 1991 investigation, the Packers and Stockyards Administration once again warned the FLCC parties that they were violating the Packers & Stockyards Act, and specifically advised Mr. Bergstrom in a letter dated June 25, 1991, that:

'During an investigation of Farmers' business operations, the following violation of the Packers and Stockyards Act was discovered.

'The investigation disclosed that Farmers, for the purpose of inducing certain owners to consign their livestock to the market, provided free transportation of livestock. The Packers and Stockyards Administration considers this an unfair and unjustly discriminatory practice under sections 307 and 312(a) of the Act.

'Enclosed is a copy of the Packers and Stockyards Act. The relevant sections can be found on pages 14 and 18. We trust you will take immediate steps to bring your operation into compliance. If you have any questions, please contact this office.'

. . . .

"34. In an interview of Mr. and Mrs. Bergstrom by Packers and Stockyards Administration investigator Rob Merritt, in connection with the 1991 investigation, the following discussion occurred on February 15, 1991:

'Merritt advised the Bergstroms that part of the reason we conducted an investigation of Farmers Livestock was because we received a complaint that they were offering free trucking to some of their consignors. Bergstrom responded with "I'm not saying I am and I'm not saying I'm not, but, free trucking is a part of doing business in this country." Bergstrom further stated that he knew of a lot of people that were offering free trucking in the area as competition is very high and this is one way to attract business.'

. . . .

"35. This statement by Mr. Bergstrom was specifically considered by Mr. Noah prior to filing suit, and was even paperclipped in his notebook as reflective of Mr. Bergstrom's attitude in violating the law. . . .

"36. The Packers and Stockyards Administration's 1991 report also reflected that trucking was not deducted from the proceeds paid to Eickman, Inc., by FLCC. Mr. Eickman indicated that he hired a trucking firm and paid the trucking directly, but the Packers and Stockyards Administration's report does not reflect that Packers and Stockyards Administration investigators ever sought, or obtained, proof of any such payment. . . .

"37. Packers and Stockyards Administration investigators also did a review of C & C Trucklines' books and records examining transactions where C & C Trucklines hauled cattle to Farmers Livestock for the period from October 17, 1991 through February 27, 1992. No explanation is provided in the Packers and Stockyards Administration's report as to why a longer time period was not examined.

Within the time period examined, however, the Dean Anderson transaction was documented as reflecting the illegal payment of free trucking. . . .

"38. Although Packers and Stockyards Administration also examined records pertinent to Gene Heyka in their 1991 investigation, the Packers and Stockyards Administration's investigators' report does not reflect that Mr. Heyka was ever contacted by Packers and Stockyards Administration investigators, and neither was any payment of free trucking to Mr. Heyka documented in this investigation. . . .

"39. In August of 1991, Dr. McCartney contacted numerous elected officials requesting their assistance in obtaining further investigation by the Packers and Stockyards Administration, or potentially the Kansas Livestock Commission, of FLCC's activities. . . .

"40. Mr. Noah's initial involvement with Dr. McCartney's claims in the underlying litigation came in October of 1991 when he was approached by Dr. McCartney with a request that he assist him in obtaining access to the books and records of the FLCC parties to definitively establish what he believed to be a pattern of illegal activity, and bring the activity to an end, through a lawsuit for damages and injunction, if necessary. . . .

"41. The first information relayed to Mr. Noah from Dr. McCartney was that he [McCartney] had noticed FLCC's sale barn was drawing consignors from various locations that were much closer to other sale barns. . . .

"42. Prior to the filing of suit, Dr. McCartney told Mr. Noah many people were telling him it was no secret that FLCC was in fact giving illegal inducements to consignors. . . .

"43. Mr. Noah thereafter obtained from Dr. McCartney a list of consignors Dr. McCartney thought could have had some illegal inducements. . . .

"44. Dr. McCartney also informed Mr. Noah he had heard Mr. Dreesen had stated that free trucking and illegal inducements were buried so deep in the books of FLCC that it could never be found by the Packers and Stockyards Administration. . . .

"45. Mr. Noah was informed, shortly after Dr. McCartney retained his services, of the prior Packers and Stockyards Administration investigations. . . . Thereafter, as an initial phase of his investigation, Mr. Noah requested and obtained, under the Freedom of Information Act, a copy of the Packers and Stockyards Administration's investigation. This information was provided to Mr. Noah by letter dated November 12, 1991, and contained the information confirming that the FLCC parties had in fact provided free trucking, and other information concerning the Packers and Stockyards Administration's investigation of the FLCC parties as has been outlined above. Mr. Noah reviewed this report at some length, and was aware of its contents prior to filing suit. . . .

"46. Prior to filing the lawsuit in the underlying litigation, Mr. Noah was aware Packers and Stockyards Administration had sent two cease and desist letters to FLCC informing it that it was unlawful to offer free trucking or other inducements. . . . Prior to filing suit, Mr. Noah was aware that back in 1985 FLCC

admitted offering free trucking in violation of Packers and Stockyards Administration's rules. . . .

"47. Prior to filing suit, Mr. Noah was also informed by Dr. McCartney of the failed 1988 investigation by Packers and Stockyards Administration, and Packers and Stockyards Administration's subsequent acknowledgment that this investigation was inadequate. . . .

"48. Prior to filing suit, Mr. Noah was aware a load of cattle owned by a consignor named Eric Anderson was diverted from McCartney's sale barn to FLCC's sale barn after Mr. Anderson received free trucking and a guaranteed price. . . .

"49. In instances where Mr. Noah felt the Packers and Stockyards Administration investigation had been incomplete he followed up with personal contacts of farmers believed to have received free trucking from the FLCC parties, and through his additional investigation developed evidence that Gene Heyka and another consignor, Mr. Johnson, had been offered free trucking by Mr. Dreesen in return for bringing their cattle to the FLCC parties' sale barn. Mr. Heyka informed Mr. Noah that Mr. Heyka and Mr. Johnson received a check for the free trucking from the Bergstrom farm account. . . .

"50. Jim Levendofsky was present during Mr. Noah's conversations with Mr. Heyka which took place in January, 1992. . . .

"51. Mr. Levendofsky informed Mr. Noah at the time of the meeting 'that it was common knowledge that they [FLCC] were paying the trucking or whatever else it took to get loads of cattle when they had to.' Mr. Levendofsky further told Mr. Noah that 'there wasn't any secret about it.' . . .

"52. In further investigation of Dr. McCartney's claims prior to suit, Mr. Noah had discussions with Lyle Koenig and/or Steve Werner concerning FLCC's payment of trucking for farmers north of the Kansas line between Fairbury and Hebron, Nebraska, and thereby inducing farmers to bring their cattle to the FLCC sale barn rather than Mr. Werner's sale barn in Fairbury, Nebraska. . . .

"53. Prior to filing the underlying litigation, Steve Werner, the owner of the sale barn at Fairbury, Nebraska, and/or Mr. Koenig, his attorney, told Mr. Noah that Mr. Dreesen was offering potential consignors of livestock in the Fairbury, Nebraska area a deal whereby C & C Truckline would haul livestock to FLCC at free or reduced rate trucking. . . . From Mr. Werner, Mr. Noah further obtained information shortly after filing of suit in the underlying litigation that Robert Kuhn, Wilburn, Nebraska, John Levendofsky, Hebron, Nebraska, Dale Shinn and Jim Williams, and his sons, Russell and Mike Williams, from the Fairbury area had, in fact, been provided free trucking by the FLCC parties. . . . Jim Williams and his sons were prepared to testify on behalf of Dr. McCartney in the underlying litigation. . . . The information from Mr. Williams and his sons was verified at some point by Lyle Koenig who personally interviewed them. . . .

"54. Further, prior to filing suit, Mr. Noah had information that Brian Larson and his father had received free trucking, possibly a guaranteed price and a one dollar per head back. . . .

"55. Mr. Noah interviewed Brian Larson prior to filing suit. . . .

"56. Brian Larson did not deny he and his father had been paid free trucking, but rather '[h]e talked all the way around the subject and pawed the dirt and wouldn't look [Noah] in the eye.' . . .

"57. When Mr. Noah took the deposition of Brian Larson, in the underlying litigation, Brian '. . . did sheepishly admit that he had gotten a check for around [$]400' from the FLCC parties for trucking. . . .

"58. Mr. Noah provided Packers and Stockyards Administration investigators with specific information concerning the Gene Heyka transaction in January of 1992, but they were unable to document the transaction. . . . This created significant concern on the part of Mr. Noah as to the thoroughness of the Packers and Stockyards Administration's investigation. . . .

"59. In February of 1992, Mr. Noah and Dr. McCartney were informed by Packers and Stockyards Administration that Packers and Stockyards Administration did not intend to continue their investigation at that time, and based upon their investigation at that point did not believe FLCC was continuing to pay trucking for customers. When confronted with the Heyka transaction, however, they were unable to explain why it had not been located. . . .

"60. Packers and Stockyards Administration's report of the January, 1992 investigation reflects that there was further investigation to be done with regard to contracting truckers, and consignors, but Packers and Stockyards Administration chose not to do this further investigation. . . .

"61. Further, prior to suit, Ben Grosse, a farmer at Jamestown, Kansas, with a large cattle interest, informed Mr. Noah prior to the time suit was filed that he had also heard that free trucking was going on at FLCC. . . .

"62. Marvin Bergstrom has never considered the payment of free or below cost trucking to consignors of a public auction a legal way to attract business. . . .

"63. In the instances in which Marvin Bergstrom gave free or reduced price trucking he probably gave this inducement with regard to large numbers of cattle as an incentive for the farmer to sell those cattle through FLCC. As he testified in his deposition in the present case:

'Q. As best you recall on those occasions, how would it come about that you did give free or reduced-rate trucking?

'A. Probably in large numbers of livestock, you know, that were incentive to get the cattle.

'Q. Large numbers to the effect of doing two things; one, obviously, you charged a tariff per head?

'A. Right.

'Q. And the bigger the numbers, the more profit in doing it?

'A. That would be correct.

'Q. The second, it tends to bring in buyers?

'A. That is second, correct.

'Q. Buyers are terribly important to you?

'A. That is exactly right.

'Q. Hopefully the more buyers you have, it sort of snowballs and the more cattle you're going to get in?

'A. That is correct.'

. . . .

"64. As the underlying litigation progressed, Mr. Werner provided additional names of consignors who had been provided free trucking in his area. Mr. Noah had also obtained information that C & C Truckline was hauling hogs to the Farmland plant at Crete, Nebraska and on the way back, they would pick up cattle and haul them free of charge to the Washington Sale Barn. . . . Mr. Koenig was told at some point by John Levendofsky that he had, in fact, received free trucking from the FLCC parties, but he later changed his statement. Mr. Koenig related Mr. Levendofsky's statements concerning the payment of free trucking to Mr. Noah. . . .

"65. When Mr. Bergstrom was deposed in the underlying litigation it was his testimony that FLCC had only paid trucking '[o]ne or two or three times, that's right, to the best of [his] knowledge.' . . .

"66. When deposed in the present case, it was Mr. Bergstrom's testimony that FLCC had given a very limited number of free or, reduced rate trucking over the years, probably between 5 and 15 times. . . .

"67. Although both Mr. Bergstrom and Mr. Dreesen offered and provided free trucking to consignors of livestock to FLCC, no records were maintained by them, or FLCC, to indicate whether or not free trucking had been paid to any specific individual. . . .

"68. Prior to the filing of suit, Rex Woods, the Certified Public Accountant employed to examine FLCC's books, had examined the Packers and Stockyards Administration report, and told Mr. Noah that, if the books of FLCC were right, he would find every free trucking and inducement FLCC had given. . . .

"69. Prior to the filing of suit in the underlying litigation, it was Dr. McCartney's belief, based upon a review of his sales records, which he relayed to Mr. Noah, that the illegal activities of the FLCC parties were causing significant losses to him in his sale barn business, and could over time destroy his business. . . .

"70. Sales of livestock in the market area covered by FLCC and Stockman's Livestock for the years beginning July 1, 1984, and ending June 30, 1992, were as follows:

July 1—June 20

| | 1984-1985 | 1985-1986 | 1986-1987 | 1987-1988 | 1988-1989 | 1989-1990 | 1990-1991 | 1991-1992 |
|---|---|---|---|---|---|---|---|---|
| FLCC | 14,763 | 27,254 | 29,564 | 26,547 | 25,409 | 20,501 | 23,454 | 26,480 |
| Stockman's | 31,528 | 26,683 | 32,367 | 27,053 | 26,252 | 20,060 | 16,937 | 18,097 |
| Clay Center | 17,689 | 178 | 8,419 | 13,308 | 13,748 | 9,827 | 7,757 | 5,907 |
| Marysville | 89,618 | 78,700 | 78,286 | 75,997 | 80,063 | 67,299 | 68,255 | 67,017 |

| Calendar Year | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|---|---|---|---|
| Fairbury | 29,550 | 24,281 | 22,946 | 18,884 | 13,386 | 19,026 | 25,618 | 18,414 | 20,139 |

. . . .

"71. On March 26, 1992, Mr. Noah filed suit on behalf of Dr. McCartney against the FLCC parties asserting theories of recovery under the Kansas Antitrust statutes contained in K.S.A. 50-101, 50-112, 50-132, and 50-801. . . .

"72. On October 6, 1992, as the underlying litigation went forward, Clarence L. King, Jr., one of the attorneys for the FLCC parties, wrote a letter to Mr. Noah concerning a telephone conversation in which he advised Mr. Noah that the FLCC parties were considering a malicious prosecution case if Dr. McCartney was unsuccessful in his case against them, but that the FLCC parties would be willing to forget the malicious prosecution case if Dr. McCartney was willing to dismiss his case against them at that time. . . .

"73. Mr. Noah discussed Clarence L. King's correspondence of October 6, 1992 with Dr. McCartney, and further discussed with Dr. McCartney the fact that Mr. King's call and letter came just days before Mr. Noah and Dr. McCartney were scheduled to get any meaningful discovery in the underlying case. They further discussed the fact that for approximately six months the FLCC parties had been successful in 'keeping [them] from getting anything much done.' Mr. Noah and Dr. McCartney jointly concluded it was just another stall by the FLCC parties. . . .

"74. At the time of their discussion of Clarence King's October 6, 1992 letter, Mr. Noah also discussed the advice of counsel defense to a malicious prosecution action with Dr. McCartney, and told Dr. McCartney that although he could potentially be sued for malicious prosecution if he lost the case, he did not believe he could be sued successfully due to the advice of counsel defense. . . .

"75. In accord with his discussion with Dr. McCartney, Mr. Noah thereafter sent a letter dated October 20, 1992 to Clarence King advising him that Dr. McCartney's claims would not be dismissed in return for a mutual release and an agreement of the FLCC parties not to sue Dr. McCartney for malicious prosecution. . . . Mr. Noah's letter of October 20, 1992 . . . states in pertinent part:

'I feel there is no basis for your clients taking any position other than their being upset about a full and complete investigation of their inappropriate operation of their sale barn under the existing rules and regulations. Dr. McCartney did have deep concerns about the unfair competition. He was willing to pay for an investigation on both the facts and the law. Our continued search for the facts in this case continues to provide documentation to substantiate the position we have taken for Dr. McCartney. We expect the remaining discovery to provide additional documentation.

'There was no thought when this action was finally filed to do other than prevail in this litigation. When Dr. McCartney provided us with all the information available to him, that which was available to P & S and all that was revealed in our investigation, which he paid for we made our judgment based upon the facts we then knew, as I have mentioned are being confirmed. The advice of counsel defense will protect Dr. McCartney. I seriously doubt, even if your clients are fortunate enough to win this lawsuit, there is anyone else that will be subject to any action for improper handling of this matter.

'I take your telephone call at face value. You had no improper motive and wanted to have a fair consideration of the matter. I feel we have given the matter a fair consideration and feel that your clients' concern is only to avoid their misdeeds being brought out in the open.'

"76. When Mr. Woods was finally able to obtain access to FLCC's books and records, he located forty-three (43) illegally induced transactions which he opined would have gone to Dr. McCartney's sale barn but for the illegal inducements. . . .

"77. Furthermore, Quinten Bergstrom, the son of Marvin Bergstrom, testified that no trucking fees were deducted from consignors of livestock whose livestock was hauled to FLCC by him [Quinten Bergstrom]. This involved further inducements where trucking was not paid for by consignors of FLCC. . . .

"78. As a consequence of these illegal inducements, Mr. Woods opined that Dr. McCartney suffered damages for lost profits between \$90,756.25 and \$126,718.75. . . .

"79. The foregoing findings of Mr. Woods, together with Mr. Woods' opinions, were determined by the District Court to be sufficient to present to a jury evidence of a pattern of illegal inducements by FLCC resulting in significant damage to Dr. McCartney's business. In this regard the District Court stated at pp. 17-18 of its Order granting Summary Judgment to the FLCC parties that:

'Plaintiff has presented sufficient circumstantial evidence from which a trier of fact could conclude that his decline in consignment sales was proximately caused by defendants providing free trucking and perhaps other inducements. Summary judgment cannot be granted on this basis.'

. . . .

"80. Dr. McCartney did himself pay trucking for farmers. His testimony as to such payments was that they were made as a part of his investigation of FLCC's activities to determine whether or not paying of trucking was what it took to get cattle consigned. . . . The acknowledged payments by Dr. McCartney were payments to Leonard Reedy and to Earl Neander in March of 1990. With regard to these payments Dr. McCartney testified that:

'A. Leonard Reedy situation, basically this occurred in the spring—approximately March of 1990, and I and P and S telling me that nothing's happening and I have hearsay that something is happening as far as what Washington is doing getting cattle. Washington had sold basically Leonard Reedy's cattle all the time up until this point, so I decided, well, I'm just going to see what it takes to get Leonard Reedy's cattle, and basically I just let Leonard dictate what it took. I told Leonard, I said, "What's it going to take to get your cattle?" I said, "I'd like to sell your cattle," and after some negotiations and so forth it took paying the trucking and a buck a head back, a dollar a head back.'

. . . .

'A. It occurred in the same time era. I was—my fieldman was working on Emil, a few cattle for Emil Neander. Mr. LaGasse, the auctioneer at Washington, and also one of their fieldmen were also working on the cattle. Mr. Neander

gave the indication he was probably going to go to Washington, so I told Ted, "Let's just see what it takes to get the cattle," and it took paying the trucking.'
. . . .

"81. Mr. Noah specifically questioned Dr. McCartney about any illegal transaction in which Dr. McCartney had been engaged in the initial portion of Mr. Noah's investigation of Dr. McCartney's claims. . . .

"82. These transactions of Dr. McCartney with Mr. Reedy and Mr. Neander were disclosed early on in the underlying litigation. . . .

"83. The two incidents to secure consignments from Mr. Reedy and Mr. Neander were the only illegal inducements ever given by Dr. McCartney. . . .

"84. Mr. Larry Michel, one of FLCC's attorneys in the underlying litigation, has explained at least one method used by FLCC to pay illegal inducements which would not be reflected in FLCC's books. In describing this method, Mr. Michel testified at pp. 44-46 of his deposition that:

'Q. Do you recall any witness that you visited with ever expressing any question in their mind as to whether or not Farmers Livestock had perhaps helped out a little with the trucking?

'A. As was indicated previously, I recall that there were a couple of instances that we were aware of that were—where trucking had been paid.

'Q. Were you aware of that as a result of your investigation and the witnesses that you talked to?

'A. Partly.

'Q. Okay. What witnesses did you talk to that indicated that Farmers Livestock had at least helped out with the trucking?

'A. If you are wanting names, I am probably not going to be able to do that.

'Q. Tell me where you talked to them if you remember that or how you talked to them.

'A. We met a couple of guys at a little restaurant in some town between Belleville and Courtland I believe; it might have been Courtland. But there is one of those small little towns on that stretch of highway, and we met some people at a restaurant, and that issue was discussed.

'Q. Do you remember what they said?

'A. Basically on one or two occasions that one or more of the defendants had basically paid a pretty good price for hay as a way of indirectly reimbursing them for some of their trucking.

'Q. In other words, the check might have been on the personal account of Mr. Bergstrom or Mrs. Bergstrom showing that the payment was for hay when really it was reimbursement for trucking?

'A. As I recall, they really did buy the hay, but they paid—let's put it this way: The other party got a pretty good price for their hay.

'Q. Pretty good in the context of more than it was normally worth, true?

'A. That's correct.'
. . . .

"85. Although Mr. Bergstrom is President of FLCC, Mr. Dreesen is Vice-President, and Karen Dreesen is secretary of FLCC, they have never received a salary from FLCC. Rather, instead of a salary they periodically receive a portion of the profits from FLCC with one-half going to Mr. and Mrs. Bergstrom and one-half to Mr. and Mrs. Dreesen. . . .

"86. Karen Dreesen, the 'secretary' of FLCC, doesn't know if there is a board of directors of FLCC, the corporation, and in her words '[w]e four people are part of and are the Farmers Livestock Commission Company. . . .' The four people referred to by her are the Bergstroms and the Dreesens. Furthermore, she has no knowledge of any stock certificates ever being issued with regard to FLCC. . . .

"87. In the underlying litigation it was established that FLCC has maintained no original memoranda. If an original memoranda—invoices had been made, it would have been destroyed within 60 days after preparation. . . .

"88. Throughout the course of the operation of the FLCC sale barn the expenses incurred by Mr. Bergstrom and Mr. Dreesen in using their vehicles, and paying for insurance on their vehicles for use of the vehicles in performing FLCC business, have been paid out of the Bergstrom and Dreesen farm account, not by FLCC. No claim for reimbursement of expenses has ever been made by Mr. Dreesen to FLCC, and so far as Mr. Dreesen is aware no claim for such expenses has been submitted by Mr. Bergstrom either. . . .

"89. FLCC officers have failed to:

(a) Give Notice of Directors meetings;

(b) Adopt by-laws;

(c) Hold an election of officers; and

(d) Pass a resolution giving authority to act to any officers.

. . . .

"90. FLCC has failed to pay dividends. . . .

"91. Prior to filing the underlying litigation, Mr. Noah researched the potential for filing claims on behalf of Dr. McCartney under RICO, the Federal Antitrust Statutes, and under the Kansas Restraint of Trade Statutes, also commonly referred to as the Kansas Antitrust Statutes. Having completed his research prior to the filing of suit, Mr. Noah determined that, although claims could potentially be stated under RICO and the Federal Antitrust Statutes, the claims under the Kansas Antitrust Statutes provided what was in his opinion the best avenue for success in the shortest period of time while still leaving open the potential for filing claims in Federal Court under RICO and/or the Federal Antitrust Statutes if they appeared to be more advantageous, at a later point in time. This was a probability because the statute of limitations under the Kansas Antitrust Statutes is two years whereas the statute of limitations under RICA and the Federal Antitrust Statutes was four years. His research further established that the federal antitrust claims could not be filed in state court because the federal courts had exclusive jurisdiction of these claims. . . .

"92. No evidence exists that Mr. Noah instituted or pursued McCartney's claims against FLCC out of an improper motive. Mr. Bergstrom testified in his deposition that:

'Q: All right. Have you obtained any information that leads you to believe that prior to initiating the underlying litigation of Mr. Noah or his law firm had any ill will or bad feelings toward either you or your wife or the Dreesens or their company?
'A: Well, I think that probably was answered in the form of a question but to answer, no.

. . . .

'Q: (By Mr. King) All right. Have you at any time obtained any information that leads you to believe that either Mr. Noah or anyone in Mr. Noah's law firm had any ill will toward either you or your wife, or the Dreesens, or Farmers Livestock Company prior to him filing the underlying litigation on behalf of Dr. McCartney?
'A: Now you're saying prior to that?
'Q: Yes, sir.
'A: Okay. That was prior to them filing the litigation against us?
'Q: Yes, sir.
'A: We've answered that, no. We've answered that several times.
'Q: All right. Do you have any information as we sit here today that leads you to believe that Mr. Noah or his law firm brought the underlying litigation on behalf of Dr. McCartney for a purpose other than obtaining a proper adjudication of Dr. McCartney's claims against you, your wife, the Dreesens and the Farmers Livestock Company?
'A: Do I have any knowledge that would make me believe that Mr. Noah brought the action against us from any other reason representing Dr. Mc-Cartney? Is that correct?
'Q: (By Mr. King) Any other reason other than representing Dr. McCartney and obtaining an adjudication of the claims that Dr. McCartney had against you and your wife, the Dreesens and Farmers Livestock Company?
'A: I wouldn't know of them, no.'

. . . .

"Marilyn Bergstrom testified in her deposition that:
'Q: Do you have any information indicating that in bringing Dr. McCartney's claims in the underlying litigation that Mr. Noah was acting for some purpose other than obtaining an adjudication of Dr. McCartney's claims against the parties in the underlying litigation?
'A. I guess I really don't know. I will answer no.'

. . . .

"Karen Dreesen testified in her deposition that:
'Q: Do you have any information that indicates that Mr. Noah pursued claims on behalf of Dr. McCartney in the underlying litigation for a purpose other than obtaining a proper adjudication of those claims?

'A: I have no information.

. . . .

'Q: There's also been reference to a statement allegedly made by Mr. Noah where he said that "Even if Farmers Livestock parties won the underlying litigation, they'd be so sick and tired of litigation by the time the underlying case was over that they would never sue us." Have you ever heard anything about that statement being made?

'A: Yes, I did.

'Q: When did you hear that?

'A: I don't know when I did. I just know my husband mentioned the statement to me.

'Q: Do you have any reason to believe that Mr. Noah brought the claim on behalf of Dr. McCartney in the underlying litigation for a purpose other than obtaining a proper adjudication of Dr. McCartney's claims against you and your husband and the Bergstroms?

'A: No.'

. . . .

"Ben Dreesen testified in his deposition that:

'Q: Do you have any information that indicates to you that Don Noah brought the claims of Dr. McCartney in the underlying litigation for a purpose other than obtaining a proper adjudication of those claims against the parties named in the underlying litigation?

'A: I don't know if he had any ill will towards us.

. . . .

'Q: Let's divide this up into time frames. The lawsuit was filed in March of 1992. I'm talking about the time that the lawsuit was filed. Do you have any information to indicate that at the time the lawsuit was filed in March of 1992, that Mr. Noah was filing that lawsuit for a reason other than obtaining proper adjudication of Dr. McCartney's claims in that lawsuit?

'A: No, I did not.'

. . . .

"93. Prior to filing suit in the underlying litigation, Mr. Noah did not send the FLCC parties a prefiling demand letter. It was Mr. Noah's belief that sending a prefiling demand letter to the FLCC parties would have been a gesture without a purpose. . . .

"94. After Dr. McCartney obtained information from Eric Anderson indicating that FLCC had provided him [Eric Anderson] with free trucking and a guaranteed price, Dr. McCartney contacted Mr. Dreesen and asked him to come to the livestock market in Belleville for a visit. During this visit Dr. McCartney asked Mr. Dreesen if FLCC was offering free trucking and guaranteed prices. Mr. Dreesen denied that they had. . . .

"95. Mr. Noah concluded there was no use in sending a prefiling demand letter because it had been reported to Mr. Noah that Mr. Dreesen had told someone that FLCC had the payment of trucking and other inducements buried so deep

in the books that Packers and Stockyards Administration would never find them. . . .

. . . .

"97. A further reason Mr. Noah did not send a demand letter to FLCC prior to instituting the underlying litigation was that he was concerned the statute of limitations was close to expiring. In fact, Mr. Noah has a note from his very first conference with Dr. McCartney that mentions the statute of limitations. . . .

"98. In making the decision to file Dr. McCartney's suit in state court rather than federal court, Mr. Noah analyzed the following legal, and strategic, issues prior to the filing of suit:

(a) He determined that Dr. McCartney had potential claims under state antitrust laws, under RICO, under the Packers and Stockyards Act, and under the Sherman Antitrust Act. . . .

(b) He determined that claims under the Sherman Antitrust Act, and the Packers and Stockyards Act could not be filed in state court. . . .

(c) He determined that the statute of limitations for state antitrust claims was two years whereas the statute of limitations for claims under RICO and the Federal Antitrust statutes was four years. . . .

(d) He determined that there were arguments which he believed to be reasonable which could be made under state law to prove Dr. McCartney's claims with or without proof of conspiracy. . . .

(e) He analyzed the remedies available in state court as compared to the remedies available in federal court. . . .

(f) He analyzed whether he would be able to get better discovery in state court than federal court. . . .

(g) He analyzed the time he believed it would take to get to trial in state court as opposed to federal court. . . .

(h) He analyzed the cost of travel associated with state court as opposed to federal court. . . .

(i) He considered Dr. McCartney's desire to have his case tried to a Republic County jury. . . .

"99. Prior to filing suit, Mr. Noah discussed with Dr. McCartney both the alternative of filing suit in state court, and the alternative of filing in federal court, and they agreed that suit would be filed in state court not federal court. . . .

"B ADDITIONAL FACTS SUBMITTED ONLY IN SUPPORT OF SUMMARY JUDGMENT ON MALPRACTICE CLAIM.

"100. Dr. McCartney had his first meeting with Mr. Noah in the first part of October, 1991. . . .

"101. . . . [T]he Contract of Employment signed and entered into by and between Dr. McCartney and Mr. Noah in October of 1991, . . . provides in pertinent part that:

'1. The Client retains and employs the Attorneys for the purpose of instituting, prosecuting, or adjusting a claim or claims as may be deemed advisable

by Attorneys to recover on behalf of Client for an injunction and damages against Farmers Livestock Commission Company, Inc., and the owners and operators thereof.

'2. The Attorneys agree to use their best efforts to assert or defend such claim and to secure for the Client such legal remedies as the Client may be entitled. It is understood that Attorneys shall have the exclusive right to take all legal steps to prosecute the claim but that the Attorneys will not settle any claim without the approval of the Client.

'3. Client agrees to advance a suit fee of $5,000.00 to be deposited in attorneys Trust Account. The fee shall be applied against actual legal services performed for the client and for costs and expenses incurred. Attorneys will periodically account for withdrawals from the suit fee. Clients agree that the suit fee is not necessarily the total fee and agree to deposit additional funds as required to continue the matter.

'4. In consideration of the services performed and to be performed by the Attorneys, the Client agrees to pay Eighty-five dollars ($85.00) per hour for Don W. Noah's time, Seventy-five Dollars ($75.00) per hour for Jerry L. Harrison's time, and Sixty-five Dollars ($65.00) per hour for Mark J. Noah's time actually and necessarily spent on the matter. Necessary travel at $0.25 per mile, copying costs, and toll charges to be paid at the actual costs expended.

. . . .

'6. Attorney has made no warranties as to the successful termination of the cause of action, and all expressions made by attorney relative thereto are matters of attorney's opinion only.

. . . .

"102. Dr. McCartney's entire legal malpractice claim against Mr. Noah as specifically pled in his Cross-Claim is premised on Mr. Noah's alleged negligence in not filing Dr. McCartney's antitrust case in federal court under Section 2 of the Sherman Antitrust Act as opposed to in state court under state theories. . . .

"103. Dr. McCartney himself has admitted he is not 'making any claims against Mr. Noah in this case other than what is set forth in the Cross-claim.' . . .

"104. . . . Dr. McCartney's responses to Defendant Don W. Noah's . . . interrogatories . . . describe no claim in addition to the claims set forth in Dr. McCartney's filed Cross-claim. . . .

"105. Prior to receipt of the Cross-claim by Dr. McCartney, Mr. Noah received a letter from Dr. McCartney's attorney, Bert Braud, which outlined the factual basis for Dr. McCartney's legal malpractice claim. . . .

"106. Mr. Braud's letter of September 12, 1995 to Mr. Noah stated the basis of Dr. McCartney's malpractice claim was that Dr. McCartney's ' . . . case clearly should have been filed in federal court, alleging violation of the Sherman Anti-Trust Act.' Mr. Braud's letter further states that [under Section 2 of the Sherman Antitrust Act] ' . . . an attempt to monopolize would have been easy to prove, a conspiracy to monopolize was impossible to prove.' . . .

"107. Dr. McCartney has designated Brian G. Grace, an attorney affiliated with the Wichita law firm of Grace, Unruh & Pratt, L.C., as his legal malpractice expert. . . .

"108. Mr. Grace is not holding himself out as an expert in antitrust law. . . .

"109. Mr. Grace has never been involved in litigation filed under state antitrust laws. . . .

"110. Mr. Grace is 'not so sure [he] [has] ever even looked at an antitrust state or federal [statute] for what Dr. McCartney had.' . . .

"111. Regarding Kansas antitrust statutes, Mr. Grace 'did absolutely no research whatsoever other than to read the briefs, memoranda, and opinions issued in this case.' . . .

"112. Mr. Grace does not have any litigation experience with the Packers & Stockyards Act and he is positive he has never evaluated any cases under the Packers & Stockyards Act. . . .

"113. Mr. Grace admits he knows nothing about Mr. Noah's experience in complex business litigation. . . .

"114. Mr. Grace has not done the work that would be necessary to determine if Dr. McCartney had a viable federal antitrust case, '[b]ut if there [was] one, [he] would be terribly surprised.' He just doesn't think one exists. . . .

"115. Mr. Grace doesn't have much of an opinion and he was pretty skeptical about whether there was any kind of a federal lawsuit or any lawsuit as far as that goes. . . .

"116. Mr. Grace admits there were no viable legal theories pertaining to Dr. McCartney's case which Mr. Noah should have identified and did not identify. . . .

"117. Mr. Grace admits 'the issue that was ultimately decided by the Kansas Court of Appeals was not an issue that had been previously litigated and decided in the Kansas Court.' . . .

"118. Mr. Grace is not aware of any Kansas cases which existed prior the time the Court of Appeals issued its decision in the underlying litigation which held that a conspiracy was required to be proved under all of the statutes that Mr. Noah was pleading on behalf of Dr. McCartney in the underlying litigation. . . .

"119. Mr. Grace's initial report with respect to this matter was set forth in a letter dated June 6, 1996 . . . .

"120. Mr. Grace's second and final report is set forth in a letter dated November 21, 1996. . . .

"121. It is Mr. Grace's opinion 'that a reasonably prudent attorney reading the Kansas Statutes relied upon by Mr. Noah would, based upon simply reading the statutes, reach a conclusion that Dr. McCartney had no viable claim under those statutes.' . . .

"122. It is Mr. Grace's opinion that Mr. Noah should have consulted an expert to interpret the Kansas Antitrust Statutes. However, Mr. Grace did not think it was necessary that he [Mr. Grace] consult with an expert himself in interpreting

the Kansas Statutes and prior to rendering an opinion that Mr. Noah committed malpractice. . . .

"123. Mr. Grace is also of the opinion that Mr. Noah should have referred Dr. McCartney's case to another attorney so that the case could have been filed in federal court rather than state court. . . .

"124. Mr. Noah's expert, George Leonard, an attorney possessing expertise in federal and state antitrust law, is of the opinion that Dr. McCartney's claims were properly filed in state court as opposed to federal court. . . .

"125. Dr. McCartney admits that prior to June, 1995, he was informed he 'need[ed] to get in gear and get someone lined up for filing this [the federal case] in federal court before the statute of limitations expire[d] in June of 1995.' . . .

"126. Dr. McCartney also admits he was aware in January, 1995, that Mr. Noah was not going to pursue a federal action on his behalf. . . .

"127. Dr. McCartney knew in January, 1995 that if he was going to pursue a federal antitrust case, he was going to have to find an attorney other than Mr. Noah to file that claim. . . .

"128. Dr. McCartney, from early on in the underlying litigation, was informed by Mr. Noah that the statute of limitations on a federal antitrust action would expire in June, 1995. . . .

"129. In the time between January, 1995 and June, 1995, Dr. McCartney met and discussed his case with several attorneys. . . .

"130. In early 1995, Mr. Noah informed Dr. McCartney that he [Noah] had spoken with Lyle Koenig and Mr. Koenig felt that Dr. McCartney's federal case had merit and Mr. Koenig would take it but he would be unable to take it on a contingent-fee basis. . . .

"131. In the early part of 1995, Dr. McCartney contacted attorney Percy Collins. . . .

"132. After contacting Mr. Collins, Dr. McCartney met with Darrell E. Miller on March 8, 1995 and discussed his federal antitrust case with him. Mr. Miller reviewed various materials provided to him by Dr. McCartney, and provided him with a written analysis of his claims on April 10, 1995, but did not suggest that Dr. McCartney pursue his claims under the Sherman Antitrust Act notwithstanding the fact Dr. McCartney discussed this issue with him, and paid Mr. Miller for an opinion as all aspects of his case. . . .

"133. Following his discussions with Mr. Miller, Dr. McCartney met with Attorney Jan Hamilton on April 26, 1995 . . . and discussed with Mr. Hamilton the federal action against FLCC under Section 2 of the Sherman Antitrust Act. In May of 1995, Mr. Hamilton specifically advised Dr. McCartney of impending statute of limitation difficulties, and provided him with names of other attorneys to consult concerning his antitrust claim. . . .

"134. Notwithstanding his consultation with numerous attorneys between January, 1995, and June, 1995, Dr. McCartney consciously decided not to file a cause of action in federal court under the Sherman Antitrust Act. . . .

"135. Mr. Grace admits an attorney can never absolutely insulate a client from being sued in a malicious prosecution action that has no merit. . . .

"136. Dr. McCartney, through his attorney, has declared the malicious prosecution claim against him is baseless and without merit. . . .

"137. One of the assumptions supporting Mr. Grace's opinions set forth in his November 21, 1996 letter is that the *Nelson v. Miller* case requires an attorney to send a demand letter prior to filing a lawsuit in every case. . . .

"138. It is Mr. Grace's opinion the *Nelson v. Miller* case requires an attorney to send a demand letter regardless of the circumstances the attorney is faced with. . . .

"139. Mr. Grace denies there is language in the *Nelson v. Miller* case that indicates an attorney can proceed with the filing of a lawsuit without sending a demand letter if the attorney has a concern with regard to the statute of limitations. . . .

"140. Dr. McCartney asserts in his deposition that at his first meeting with Mr. Noah in October of 1991, Mr. Noah represented to him his case could be ready for trial for a total of $12,000. . . .

"141. Prior to filing suit, Mr. Noah provided Dr. McCartney with a fee estimate regarding attorneys fees which might be incurred in the underlying litigation to get into the books of the FLCC parties indicating to Dr. McCartney that '[He] had no idea.' However, Dr. McCartney kept pressing to obtain Mr. Noah's best judgment. Mr. Noah finally advised Dr. McCartney that '. . . I don't know how hard they're going to fight. . . . [I]t could be anything from 12, 15, or 20, or 25. I don't know.' . . .

. . . .

"143. At the time that the alleged discussion concerning a $12,000 estimate to get the case ready for trial, Dr. McCartney 'understood at the time that [he] had that discussion that it was in fact an estimate.' . . .

. . . .

"145. Dr. McCartney also understood that at the time Mr. Noah gave the alleged estimate of $12,000, Mr. Noah had not done any investigation of the case; had not had an opportunity to review Dr. McCartney's records or the records of the FLCC; had not had the opportunity to do any research into the law applicable to Dr. McCartney's case; did not know the specifics of the type of claim that eventually might be filed; and, did not know whether the claim would be filed at all. . . .

"146. It was shortly after this initial meeting with Mr. Noah that Dr. McCartney received, by mail, a contract of employment from Mr. Noah. . . .

"147. After reviewing the employment agreement, and noting there was no reference to the $12,000 amount in the agreement, Dr. McCartney signed the agreement and sent it with a check for $5,000 to Noah. . . .

"148. Dr. McCartney admits that in October, 1991, he did not bring to Mr. Noah's attention the fact that the employment agreement did not contain the $12,000 estimate. . . .

"149. The Contract of Employment does not speak to any limitation on the fees to be incurred by Mr. Noah. . . .

"150. The contract Dr. McCartney entered into and bound himself to was for a specified hourly fee for the 'time actually and necessarily spent on the matter.' . . .

"151. Mr. Noah's expert has concluded 'the time spent on the particular items of legal work by Noah was reasonable.' . . .

"152. Dr. McCartney has no reason to believe Mr. Noah did not actually work the hours charged Dr. McCartney and Dr. McCartney admits he agreed to pay Mr. Noah on an hourly basis. . . .

"153. Dr. McCartney admits Mr. Noah was putting in the hours he was charging in an effort to further Dr. McCartney's position in the underlying litigation. . . .

"154. Dr. McCartney believes Mr. Noah and his firm 'were charging an accurate amount for the work that they were doing.' . . .

"155. Dr. McCartney admits he left it up to Mr. Noah to 'do what was necessary in terms of the theories of the case, where the case was filed, what amendments to pleadings were made, that sort of thing, anything having to do with legal decisions.' . . .

"156. Dr. McCartney testified he found Mr. Noah to be very fair and truthful in his dealings with him. . . .

"157. Dr. McCartney admits there were never any written objections made by him or on his behalf to the periodic billings sent to him by Mr. Noah. . . .

"158. It was Dr. McCartney's practice that when a bill came in from Mr. Noah he would review it and read it over to check on what Mr. Noah had been doing and to see the details of the work that had been done before turning the bill over to his wife to pay. . . .

"159. Dr. McCartney voluntarily paid all of the attorneys' fees and expenses incurred by Mr. Noah in the underlying litigation except for $4,733.21 that has yet to be paid by Dr. McCartney and is the subject of the Cross-claim filed by Mr. Noah. . . .

"160. The oral objections Dr. McCartney alleges he made to Mr. Noah concerning billing were not that Mr. Noah and Mr. Woods were charging an inaccurate amount for the work that they were doing, but rather 'were more along the lines of their inability to project what the costs of [the] case was going to be. . . .' . . .

"161. Dr. McCartney admits that during the underlying litigation '[t]here was regular discussions [between him and Noah] of what it would cost to get to the next plateau. . . .' . . .

"162. Dr. McCartney testified that when plateaus would be reached 'the actual costs were always well beyond the estimates.' . . .

"163. Further, Mr. Noah gave Dr. McCartney the opportunity at each step of the litigation to terminate the litigation should he choose to do so. . . .

"164. Dr. McCartney admits the underlying ligation 'turned out to be a very difficult case. . . .' . . .

"165. During the underlying litigation, Dr. McCartney expressed his opinion on his case as follows: '. . . I feel this case has now evolved into a legal marathon, one whose winner will be the one who is able to sacrifice the most in energy, perseverance, money and whatever else is necessary to come out on top.' . . .

"166. Dr. McCartney contends he only made payments to Mr. Noah after the alleged estimate of $12,000.00 was exceeded because Mr. Noah assured him they would be successful in the lawsuit and as part of that success Dr. McCartney would recover all of his attorneys' fees and expenses. . . .

"167. The contract entered into by Dr. McCartney expressly states that '[a]ttorney has made no warranties as to the successful termination of the cause of action, and all expressions made by attorney relative thereto are matters of attorney's opinion only.' . . .

"168. Dr. McCartney cannot point to 'any correspondence or any documentation of any kind whatsoever . . . that reflects that Mr. Noah ever told [McCartney] that he was sure that they were going to win the underlying litigation.' . . .

"169. In September of 1992, as the underlying ligation progressed, Dr. McCartney expressed to Mr. Noah his [Dr. McCartney's] concern that FLCC might win the underlying litigation. . . .

"170. In a memo written by Dr. McCartney in approximately February, 1993, shortly after the depositions of the Dreesens and the Bergstroms in the underlying litigation, Dr. McCartney wrote the following: 'I feel this case has now evolved into a legal marathon, one whose winner will be the one who is able to sacrifice the most in energy, persverance, money and whatever else is necessary to come out on top.' . . .

"171. Dr. McCartney recalls Mr. Noah told him when the underlying litigation first got under way that the case would be like a roller coaster. 'Some days will be up, and some days will be down.' . . .

"172. Prior to the taking of Dr. McCartney's deposition in the underlying litigation, Mr. Noah warned Dr. McCartney that if it was established he knew about FLCC parties' activities prior to June of 1991, Dr. McCartney would lose his case. . . .

"173. Dr. McCartney understood that what the jury decided at the trial of the case would depend in part upon whether or not the jury believed the testimony of Dr. McCartney and his expert Mr. Woods. . . .

"174. The only conversation Dr. McCartney can specifically recall wherein he alleges Mr. Noah gave him assurances of success in the underlying litigation is a conversation which occurred in the spring or summer of 1993. . . .

"175. Dr. McCartney's recollection of his conversation with Mr. Noah in the spring or summer of 1993 is as follows:

'Q. What words did Mr. Noah use to express that to you sir?

'A. I think I just asked him one day what he would project in this case, and his response is that he had seen several of these comparable type cases, and worst case scenario is they will only think we were damaged to a slight amount

all the way up to they will accept the fact of what Rex Woods is projecting. But he said, more than likely, they would award you somewhere in between.

"And so 1 felt that what he was telling me was that the results of this trial was going to be that I was going to get recovery of cost of action and that the jury was going to award us somewhere in between and the $100,000 roughly that Rex Woods is projecting as an expert witness and whatever that amount was would automatically be tripled.'

. . . .

"176. Dr. McCartney admits the alleged conversation he had with Mr. Noah in the spring or summer of 1993 was nothing more than a projection by Mr. Noah. . . .

"177. Dr. McCartney understands that projections at times are realized and at times they are not realized. . . .

"178. . . . Mr. Leonard's qualifications as an antitrust expert, and opinions regard Dr. McCartney's malpractice claim, are set forth in detail in Mr. Leonard's Affidavit which is incorporated herein by this reference. Mr. Leonard has practiced in the area of antitrust law for over thirty years, and has handled a wide variety of antitrust matters in both state and federal courts during the course of his practice. In summary, it is Mr. Leonard's opinion that:

'(a) Mr. Noah's decision to file Dr. McCartney's claims in state court rather than federal court was not only a defensible decision, but the correct decision;

'(b) Mr. Noah's fees and estimate of fees in the underlying litigation were reasonable; and

'(c) The underlying litigation filed by Mr. Noah had a sound chance of success.' "

## DISCUSSION AND ANALYSIS

### Standard Of Review

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence,

summary judgment must be denied. *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131-32, 955 P.2d 1189 (1998).

An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 189, 891 P.2d 385 (1995).

The McCartneys filed their cross-claim of legal malpractice on the basis that Noah was negligent in not filing the antitrust action in a federal district court on the basis of Section 2 of the Sherman Antitrust Act. This constituted their sole theory up until the time they responded to Noah's motion for summary judgment. In their response to Noah's motion for summary judgment, the McCartneys then claimed a second theory, *viz.*, that Noah should never have filed the antitrust action at all. The trial court resolved this case by granting summary judgment to Noah on both theories, referring to the McCartneys' second theory as the "mutated claim."

## SECTION 2 OF THE SHERMAN ANTITRUST ACT

The McCartneys claimed that Noah breached his duty and was negligent in causing damages to the McCartneys by failing to prosecute the McCartneys' claim against the FLCC parties in federal court under Section 2 of the Sherman Antitrust Act. The trial court disposed of this contention based primarily upon the affidavit in an opinion letter from Noah's legal expert in antitrust matters, George E. Leonard. A summary of Leonard's opinion is contained in finding No. 178, stating "Mr. Noah's decision to file Dr. McCartney's claims in state court rather than federal court was not only a defensible decision, but the correct decision."

The trial court rejected the opinion of the McCartneys' legal expert, Brian Grace, because "Mr. Grace conceded his lack of expertise in the area of antitrust law and the Kansas statutory law upon which Mr. Noah proceeded." On this issue, the trial court concluded: "It appears to the Court that the McCartneys essentially have no expert testimony to support their claims. 'Expert

testimony is generally required and may be used to prove the standard of care by which the professional activities of an attorney are measured . . . .' " (quoting *Bowman v. Doherty*, 235 Kan. 870, Syl. ¶ 7, 686 P.2d 112 [1984]).

The McCartneys did not argue before the trial court that expert testimony on the subject was not necessary or that Grace, their expert, was qualified as an expert on that subject of antitrust litigation. On appeal, the McCartneys have abandoned their claim that Noah should have filed the Kansas antitrust action in federal court. Neither in their brief nor at oral argument do they address this aspect of the trial court's award of summary judgment. "Where the appellant fails to brief an issue, that issue is waived or abandoned." *Pope v. Ransdell*, 251 Kan. 112, 119, 833 P.2d 965 (1992). Based upon the record and uncontroverted facts as found by the trial court, we affirm the summary judgment granted to Noah on the McCartneys' claim that Noah was negligent and guilty of malpractice in not prosecuting the claim under Section 2 of the Sherman Antitrust Act.

## THE MUTATED CLAIM

In their response to the summary judgment before the trial court, the McCartneys also argued a theory not raised by their pleading. Their new claim was that Noah should never have filed the underlying state antitrust action at all. The trial court elected to address the McCartneys' new claim which it referred to as the "mutated claim." Noah did not file a cross-appeal from this decision and is not now in a position to claim that the trial court erred in addressing the McCartneys' mutated claim. Moreover, under the provisions of K.S.A. 60-215(b), and *Anderson v. Heartland*, 249 Kan. 458, 470-71, 819 P.2d 1192 (1991), *cert. denied* 504 U.S. 912 (1992), while the McCartneys' mutated claim was not a theory pled in their cross-claim, it was adequately raised by the McCartneys and was an issue to be addressed within the sound discretion of the trial court.

In resolving the mutated claim, the trial court concluded:

"At oral arguments it became apparent that the McCartneys' claim has mutated during the course of discovery. It appears that the cross-claimants now allege that

Noah should not have filed this lawsuit in the first place. In other words, the cross-claimants' position is similar to the position taken by the plaintiffs [FLCC parties] in this malicious prosecution suit. In its Memorandum Decision dated June 4, 1997, the Court ruled that Noah and his clients had a reasonable claim when they commenced the underlying litigation [Kansas antitrust action]. This court reaffirms those findings and rulings and incorporates them by reference herein. Accordingly, McCartneys' last claim is untenable."

The memorandum decision referred to by the trial court was its grant of summary judgment to Noah in the malicious prosecution action. This court, in a separate opinion, affirmed the trial court's award of summary judgment in that action. See *Bergstrom v. Noah*, 266 Kan. 829, 974 P.2d 520 (1999). Thus, the question we are called upon to resolve by this appeal is whether the trial court was correct in its determination that the filing and pursuing of the Kansas antitrust action by Noah did not constitute negligence and was not malpractice.

In *Hunt v. Dresie*, 241 Kan. 647, 660, 740 P.2d 1046 (1987), we addressed legal malpractice and held that in order to prevail on a claim of legal malpractice, a plaintiff is required to show (1) the duty of the attorney to exercise ordinary skill and knowledge, (2) a breach of that duty, (3) a causal connection between the breach of duty and the resulting injury, and (4) actual loss or damage. *Hunt v. Dresie* involved a complicated set of facts growing out of multiple lawsuits filed between parties previously involved in a partnership. Highly summarized, Hunt sued his attorney, Dresie, who had represented him by filing a previous action against his partner, Sampson. Sampson filed suit against Hunt for malicious prosecution. Judgment was entered against Hunt for malicious prosecution in an amount of $20,000 actual damages and $600,000 punitive damages. See *Sampson v. Hunt*, 233 Kan. 572, 577, 665 P.2d 743 (1983).

After the entry of the malicious judgment against him, Hunt sued his attorneys, claiming they were (1) negligent in filing two cases against his former partner Sampson and (2) negligent for failing to assert the advice of counsel defense in the malicious prosecution action. The district court held that the defendant's attorneys lacked probable cause to file the two cases and were negligent as a matter of law in doing so. 241 Kan. at 654.

Even though a determination had been made in *Sampson* that probable cause was lacking in the filing of the two lawsuits, we noted that in the matter of attorney malpractice, negligence is a question normally decided by the trier of fact:

"The difficulty herein lies in the fact that the finding of negligence was made in a motion for summary judgment. Had the finding been made following a bench trial, we would be in an entirely different situation on appellate review. Whether or not defendants were negligent in filing the suits depends upon the totality of the circumstances as determined by the trier of facts. Because district judges and appellate court judges are, themselves, attorneys, they naturally have opinions as to whether or not certain conduct constitutes legal malpractice. It is easy to slip into the trap of deciding such questions 'as a matter of law.' Not having a like expertise in other professions such as medicine or architecture, the issues of professional negligence there are routinely submitted to juries. Nevertheless, claims of legal malpractice, like other forms of malpractice, are normally to be determined by the trier of fact rather than by summary judgment." 241 Kan. at 656.

The mutated claim in this case is one of legal malpractice and involves the issue of professional negligence. The McCartneys argue that *Hunt v. Dresie* requires reversal of the summary judgment and remand for a factual determination of negligence. However, while we have held that questions of professional negligence should be left to the trier of fact, there is a recognized exception to this rule. When, under the totality of circumstances as demonstrated by the uncontroverted facts, a conclusion may be reached as a matter of law that negligence has not been established, judgment may be entered as a matter of law. See *Phillips v. Carson*, 240 Kan. 462, 472-73, 731 P.2d 820 (1987).

The trial court in its grant of summary judgment concluded that the McCartneys' legal malpractice action was untenable because probable cause existed for the filing of the Kansas antitrust action. In this respect, this case differs from *Hunt* which relied on the judicial determination in *Sampson* that probable cause did not exist for the filing of the underlying two actions. We disagree with the trial court that a finding of probable cause to file the antitrust action alone supports summary judgment in the malpractice action at hand. At most, it is a factor to be considered in determining whether summary judgment was proper. However, "[a] trial court decision which reaches the right result will be upheld, even though

the trial court may have relied upon the wrong ground or assigned erroneous reasons for its decision." *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993).

Both before the trial court and on appeal, the McCartneys rely upon the deposition testimony and letter opinions of their legal expert, Brian Grace. They contend that his opinion alone raises genuine issues of material fact which requires us to reverse summary judgment in this case. In his report, Grace states:

"Mr. Noah had the responsibility as a practicing attorney to use that decree of learning and skill ordinarily possessed by members of our profession under circumstances such as he faced. He had the obligation to do so with ordinary care and diligence. It is my opinion that he breached that obligation by his various acts of omission and commission, which are discussed below. It is further my opinion that the breach of that duty by Mr. Noah has caused damages to Dr. McCartney. . . .

. . . .

"The cumulative effect of the material discussed above is that Dr. McCartney should have been told that filing suit in state court, as proposed by Mr. Noah, was highly speculative, almost certainly a waste of substantial money and likely to lead to retaliatory litigation. It does not appear that advice was ever given to Dr. McCartney."

The trial court in its memorandum decision rejected the testimony of Grace because "in the course of discovery, Mr. Grace conceded his lack of expertise in the area of antitrust law and the Kansas statutory law upon which Mr. Noah proceeded." The court underscored this conclusion in its finding of fact:

"108. Mr. Grace is not holding himself out as an expert in antitrust law. . . .

"109. Mr. Grace has never been involved in litigation filed under state antitrust laws. . . .

"110. Mr. Grace is 'not so sure [he] [has] ever even looked at an antitrust state or federal [statute] for what Dr. McCartney had.' . . .

"111. Regarding Kansas antitrust statutes, Mr. Grace 'did absolutely no research whatsoever other than to read the briefs, memoranda, and opinions issued in this case.' . . .

"112. Mr. Grace does not have any litigation experience with the Packers & Stockyards Act and he is positive he has never evaluated any cases under the Packers & Stockyards Act. . . .

"113. Mr. Grace admits he knows nothing about Mr. Noah's experience in complex business litigation. . . .

"114. Mr. Grace has not done the work that would be necessary to determine if Dr. McCartney had a viable federal antitrust case, '[b]ut if there [was] one, [he] would be terribly surprised.' He just doesn't think one exists. . . .

"115. Mr. Grace doesn't have much of an opinion and he was pretty skeptical about whether there was any kind of a federal lawsuit or any lawsuit as far as that goes. . . .

"116. Mr. Grace admits there were no viable legal theories pertaining to Dr. McCartney's case which Mr. Noah should have identified and did not identify. . . .

"117. Mr. Grace admits 'the issue that was ultimately decided by the Kansas Court of Appeals was not an issue that had been previously litigated and decided in the Kansas Court.' . . .

"118. Mr. Grace is not aware of any Kansas cases which existed prior the time the Court of Appeals issued its decision in the underlying litigation which held that a conspiracy was required to be proved under all of the statutes that Mr. Noah was pleading on behalf of Dr. McCartney in the underlying litigation."

In granting summary judgment in the malicious prosecution action filed against the McCartneys and Noah, the trial court concluded that probable cause existed for filing the Kansas antitrust action based upon the questionable state of antitrust law in Kansas:

"The Court further concludes that the named defendants had a sufficient basis in the law which amounted to probable cause for filing the underlying lawsuit. Don Noah concluded that the lawsuit should be filed under K.S.A. 50-101, K.S.A. 50-132, K.S.A. 50-112 and K.S.A. 50-801. Noah relied on these statutes as authority that offered a reasonable probability of injunctive relief and damages to his client. K.S.A. 50-112, and other statutes relied on by the plaintiffs in the underlying litigation are broad and undeveloped by case law. Therefore, Mr. Noah could have reasonably believed that McCartney's claim, even with the difficult issue of conspiracy, would be a suitable vehicle to develop the law of this state. Hindsight notwithstanding, the Court concludes that a colorable claim existed."

In *Bergstrom v. Noah*, 266 Kan. 829, we examined the statutes above referenced by the trial court and the state of antitrust law in Kansas at the time Noah filed the Kansas antitrust lawsuit on behalf of the McCartneys. We concluded that the statutes were broad and there had been no meaningful interpretation of the statutes in Kansas. We noted that statutes relied upon by Noah were enacted in 1889, 1897 (a year before Congress passed the Sherman Act), and 1899, and had been virtually ignored since then, providing little if any guidance for lawsuits brought under the statutes. We further noted that although the Court of Appeals in the underlying anti-

trust action had found that the standards set by the Sherman Antitrust Act should apply, until that decision by the Court of Appeals, the matter was by no means settled. We held that given the state of antitrust law in Kansas and the uncontroverted facts, Noah's belief that there was a sound chance the claims made in the antitrust action might be held legally valid upon adjudication was not an unreasonable one.

In *Hunt v. Dresie,* we dealt with the defense of error of judgment in a legal malpractice case. We recognized such a defense but cautiously noted:

" 'In one legal malpractice treatise, the authors point out a problem with the concept [of error of judgment]. "Notwithstanding centuries of applying the error of judgment rule in attorney malpractice actions, the courts have not analyzed or defined the judgmental process being protected." Mallen and Levit, Legal Malpractice § 211, p. 299 (2d ed. 1981).

" 'Mallen and Levit propose the following analysis of error of judgment:

" ' "Nevertheless. a client is entitled to the benefit of an informed judgment. When the issue is one that is settled and can be identified through ordinary research and investigation techniques, an attorney should not be able to avoid liability by claiming the error was one of judgment. On the other hand, when the proposition is one on which reasonable lawyers could disagree or which involves a choice of strategy, an error of informed judgment should not be gauged by hindsight or second-guessed by an expert witness. [Emphasis in original.]" Mallen and Levit, Legal Malpractice § 215, p. 311.' " 241 Kan. at 658.

The legal basis for the underlying Kansas antitrust case filed by Noah was an open question which had not been interpreted in any meaningful way by a court in this state. Grace, the legal expert for the McCartneys, recognized this fact: "I don't know of any [cases] because the issue that was ultimately decided by the Kansas Court of Appeals [in the underlying antitrust litigation] was not an issue that had been previously litigated and decided in the Kansas courts."

Nevertheless, Grace concluded without research and with an admitted lack of expertise in antitrust law:

"We have a statutory right. It either is there or it isn't there. And to go in and, in effect, try to accomplish something that is permitted under Sherman Act section two under the Kansas antitrust laws which do not read the same, they are not the same statutes, it is simply not possible. And I don't know what the problem was in understanding that. Granted, no one had litigated that specific question. But

that does not make it a legitimate candidate to spend thousands and thousands of dollars of your client's money."

On the other hand, Leonard, the legal expert employed by Noah, who was an acknowledged expert in antitrust litigation, noted that "Kansas antitrust laws were not the subject of extensive or existing case decisions. . . . Kansas Courts were not required to follow Federal antitrust decisions." Leonard opined that K.S.A. 50-101 is very broad in defining a "trust" as a combination of "two or more persons" and stated that it was not unreasonable to believe that the court might apply K.S.A. 50-101, literally, and look to the combination of Bergstroms and Dreesens as "two or more persons" for purposes of satisfying the conspiracy element. Leonard concluded that given the broad language of K.S.A. 50-101 and the lack of controlling authority in Kansas, it would be reasonable to try to persuade the court not to follow the federal rule that a corporation cannot conspire with its own agents. Further, given the unquestioned existence of some improper, if not illegal, activities by the FLCC parties which Noah had prior to the filing of the lawsuit, Leonard concluded that it would not be unreasonable for a lawyer to think that a court would be lenient or liberal to a Kansas plaintiff in its rulings applying the "conspiracy" portions of the Kansas statutes. Leonard also noted that the extraordinary remedy created by K.S.A. 50-103, which calls for the forfeiture of a corporate charter if the defendant loses an antitrust case was, in his opinion, an additional factor favoring the filing of this action in state court.

In this case, we deal with broad remedies created by statutes which have not been interpreted in any meaningful manner by a court in this state. The discussion above indicated that the antitrust laws are ones "on which reasonable lawyers could disagree." Moreover, there is no question that a lawyer could not by reading the statutes alone determine how a court in this state would rule or interpret such statutes.

"If an attorney acts in good faith and in an honest belief that his or her acts and advice are well founded and in the best interest of the client, the attorney is not liable for a mere error in judgment. Thus, an informed judgment on the part of counsel, even if subsequently proved erroneous, is not negligence. . . . [A]n attorney is not liable for an error in judgment on points of new occurrences or

doubtful construction, or for a mistaken opinion on a point of law that has not been settled by a court of last resort and on which reasonable doubt may well be entertained by informed lawyers." 7 Am. Jur. 2d, Attorneys At Law § 221.

The laws relied upon by Noah were unsettled and had not been interpreted by any court in this state. At the time the underlying action was filed, the underlying action advanced by Noah was one on which reasonable doubt may well be entertained by informed lawyers. While the exception for an error in judgment in legal malpractice actions is a narrow one and should not be employed where the issue is settled and can be identified through ordinary research and investigative techniques, the exception applies in a case such as this, where the law is unclear, unsettled by case law, and is an issue or issues upon which reasonable doubt may well be entertained by informed counsel.

Moreover, the trial court entered findings of fact which support a conclusion that Noah acted in good faith in advancing the underlying antitrust action. The court found that the uncontroverted facts established that Noah neither instituted nor pursued the McCartneys' claims against the FLCC parties out of an improper motive. We conclude the error in judgment concerning the legal viability of the underlying Kansas antitrust action filed by Noah is not a basis for a claim of legal malpractice under the facts and circumstances set forth in this opinion.

The McCartneys argue that even with respect to an unsettled area of the law, an attorney assumes an obligation to undertake reasonable research in an effort to ascertain relevant principles, and to make an informed decision as to a course of conduct based on an intelligent assessment of the problem. In support of this contention, they cite *Williams v. Preman*, 911 S.W.2d 288, 304 (Mo. App. 1995), wherein the Missouri Court of Appeals stated:

" 'A lawyer is not liable in damages to his client for a mere error in judgment on a legal proposition concerning which enlightened legal minds may fairly differ. But the same degree of diligence is required of a lawyer that is required of other men employed to render services of a technical or scientific character; and if the error is such as to evince negligence he is liable.' " (quoting *James Carr's Executrix v. Glover*, 70 Mo. App. 242, 247 [1897]).

The McCartneys argue that Noah advanced two claims in the underlying antitrust action: (1) a conspiracy to monopolize and (2) an attempt to monopolize. According to the McCartneys, the law is well settled on both counts. They apparently rely upon their conclusion that the law was "well settled" because the Court of Appeals, in deciding the underlying antitrust case, concluded that "Kansas law is clear that in order to proceed under any of these statutes, evidence of a conspiracy or trust between two or more persons or entities must be present." However, we note that until the decision of the Court of Appeals in the underlying action, that proposition of law was not at all clear in Kansas. We disagree with the Court of Appeals' conclusion that Kansas law was clear or that the proposition was well settled at the time the underlying case was presented.

The McCartneys also argue that a question of material fact remains concerning professional advice given by Noah that it would cost no more than $12,000 to bring the case to trial. The argument is that even though the claim advanced by Noah may have been a "colorable claim," an attorney has the obligation not to advance a claim where the cost of bringing the claim far exceeds the hoped-for recovery. The McCartneys argue that if they had known that pursuing the claim would have cost even $50,000, they would have chosen not to pursue it.

The following facts as found by the trial court in this case demonstrate that the purported factual dispute between the McCartneys and Noah concerning the amount of fees necessary to bring the underlying antitrust action to trial is not material and does not create a genuine issue of material fact:

"141. Prior to filing suit, Mr. Noah provided Dr. McCartney with a fee estimate regarding attorneys fees which might be incurred in the underlying litigation to get into the books of the FLCC parties indicating to Dr. McCartney that '[He] had no idea.' However, Dr. McCartney kept pressing to obtain Mr. Noah's best judgment. Mr. Noah finally advised Dr. McCartney that '. . . I don't know how hard they're going to fight. . . . [I]t could be anything from 12, 15, or 20, or 25. I don't know.' . . .

. . . .

"143. At the time that the alleged discussion concerning a $12,000 estimate to get the case ready for trial, Dr. McCartney 'understood at the time that [he] had that discussion that it was in fact an estimate.' . . .

. . . .
"145. Dr. McCartney also understood that at the time Mr. Noah gave the alleged estimate of $12,000, Mr. Noah had not done any investigation of the case; had not had an opportunity to review Dr. McCartney's records or the records of the FLCC; had not had the opportunity to do any research into the law applicable to Dr. McCartney's case; did not know the specifics of the type of claim that eventually might be filed; and, did not know whether the claim would be filed at all."

While there may have been a dispute between the McCartneys and Noah as to whether a $12,000 or a $25,000 estimation of fees was necessary to bring the case to trial, it was clear that the amount given by Noah was an estimate after a brief half hour to an hour and a half meeting among Noah, the McCartneys, and Rex Wood, C.P.A. No documents were exchanged at this meeting and, generally, the meeting involved Roger McCartney telling Noah that he believed the FLCC parties were offering their customers free trucking as an illegal or improper inducement to do business with the FLCC. The McCartneys' major purpose in obtaining counsel was Roger McCartney's recognition of the need to obtain the books and records of the FLCC so his accountant, Wood, could establish his theory and support his belief of improper activity.

Another undisputed point identified by the trial court is that Noah advised that he would not take the case on a contingent basis but would take the case on an hourly basis under contract:

"146. It was shortly after this initial meeting with Mr. Noah that Dr. McCartney received, by mail, a contract of employment from Mr. Noah. . . .

"147. After reviewing the employment agreement, and noting there was no reference to the $12,000 amount in the agreement, Dr. McCartney signed the agreement and sent it with a check for $5,000 to Noah. . . .

. . . .

"150. The contract Dr. McCartney entered into and bound himself to was for a specified hourly fee for the 'time actually and necessarily spent on the matter.'
. . .

"151. Mr. Noah's expert has concluded 'the time spent on the particular items of legal work by Noah was reasonable.' "

The above facts as found by the trial court in its grant of summary judgment established that the McCartneys knew the amount of the fee was an estimate and that the basis of the fee would be

on an hourly rate according to an agreement signed by both of the parties. Regular statements were presented by Noah and paid by Roger McCartney. The contract of employment signed by Noah and McCartney provided:

"1. The Client retains and employs the Attorneys for the purpose of instituting, prosecuting, or adjusting a claim or claims as may be deemed advisable by Attorneys to recover on behalf of Client for an injunction and damages against Farmers Livestock Commission Company, Inc., and the owners and operators thereof.

"2. The Attorneys agree to use their best efforts to assert or defend such claim and to secure for the Client such legal remedies as the Client may be entitled. It is understood that Attorneys shall have the exclusive right to take all legal steps to prosecute the claim but that the Attorneys will not settle any claim without the approval of the Client.

"3. Clients agree to advance a suit fee of $5,000.00 to be deposited in attorneys Trust Account. The fee shall be applied against actual legal services performed for the client and for costs and expenses incurred. Attorneys will periodically account for withdrawals from the suit fee. Clients agree that the suit fee is not necessarily the total fee and agree to deposit additional funds as required to continue the matter.

"4. In consideration of the services performed and to be performed by the Attorneys, the Client agrees to pay Eighty-five dollars ($85.00) per hour for Don W. Noah's time, Seventy-five Dollars ($75.00) per hour for Jerry L. Harrison's time, and Sixty-five Dollars ($65.00) per hour for Mark J. Noah's time actually and necessarily spent on the matter. Necessary travel at $0.25 per mile, copying costs, and toll charges to be paid at the actual costs expended.

. . . .

"6. Attorney has made no warranties as to the successful termination of the cause of action, and all expressions made by attorney relative thereto are matters of attorney's opinion only."

Consistent with the contract, the uncontroverted facts show that regular statements regarding time spent in pursuit of the case by Noah were sent to the McCartneys:

"152. Dr. McCartney has no reason to believe Mr. Noah did not actually work the hours charged Dr. McCartney and Dr. McCartney admits he agreed to pay Mr. Noah on an hourly basis. . . .

"153. Dr. McCartney admits Mr. Noah was putting in the hours he was charging in an effort to further Dr. McCartney's position in the underlying litigation. . . .

"154. Dr. McCartney believes Mr. Noah and his firm 'were charging an accurate amount for the work that they were doing.' . . .

"155. Dr. McCartney admits he left it up to Mr. Noah to 'do what was necessary in terms of the theories of the case, where the case was filed, what amendments

to pleadings were made, that sort of thing, anything having to do with legal decisions.' . . .

"156. Dr. McCartney testified he found Mr. Noah to be very fair and truthful in his dealings with him. . . .

"157. Dr. McCartney admits there were never any written objections made by him or on his behalf to the periodic billings sent to him by Mr. Noah. . . .

"158. It was Dr. McCartney's practice that when a bill came in from Mr. Noah he would review it and read it over to check on what Mr. Noah had been doing and to see the details of the work that had been done before turning the bill over to his wife to pay. . . .

"159. Dr. McCartney voluntarily paid all of the attorneys' fees and expenses incurred by Mr. Noah in the underlying litigation except for $4,733.21 that has yet to be paid by Dr. McCartney and is the subject of the Cross-claim filed by Mr. Noah. . . .

"160. The oral objections Dr. McCartney alleges he made to Mr. Noah concerning billing were not that Mr. Noah and Mr. Woods were charging an inaccurate amount for the work that they were doing, but rather 'were more along the lines of their inability to project what the costs of [the] case was going to be. . . .' . . .

"161. Dr. McCartney admits that during the underlying litigation '[t]here was regular discussions [between him and Noah] of what it would cost to get to the next plateau. . . .' . . .

"162. Dr. McCartney testified that when plateaus would be reached 'the actual costs were always well beyond the estimates.' . . .

"163. Further, Mr. Noah gave Dr. McCartney the opportunity at each step of the litigation to terminate the litigation should he choose to do so. . . .

"164. Dr. McCartney admits the underlying ligation 'turned out to be a very difficult case. . . .' . . .

"165. During the underlying litigation, Dr. McCartney expressed his opinion on his case as follows: '. . . I feel this case has now evolved into a legal marathon, one whose winner will be the one who is able to sacrifice the most in energy, perseverance, money and whatever else is necessary to come out on top.' "

The McCartneys argue that the Kansas antitrust case should never have been filed and it was negligence to file the case. We conclude that ultimately Noah erred in his judgment that a legally viable claim existed under the antitrust laws of this state. This error, where the law is unsettled and subject to interpretation with very little guidance from a court of last resort and involving issues upon which attorneys with enlightened minds could disagree, constitutes an error of judgment under the narrow exception recognized in *Hunt v. Dresie*. Once it is established that no negligence was in-

volved in the filing of the Kansas antitrust action, the McCartneys' claim that the fees paid constituted a waste of resources fails to stand. Roger McCartney entered into a contract of employment with Noah, the terms of which were clear and unambiguous. Among the important conditions of employment, the contract provided that Noah made no warranties as to the success of the action to be filed.

Throughout the case, there was no dispute concerning the time spent by Noah filing and pursuing the McCartneys' antitrust action. The fees were based upon contract and subject to periodic review and payment by the McCartneys. There was no claim that the time expended by Noah was unreasonable. Based upon the record and uncontroverted facts as determined by the trial court, we conclude that summary judgment was appropriately entered.

Affirmed.