No. 118,688

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ZACHARY SHORT,
*Appellant*,

v.

BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.,
*Appellee*.

SYLLABUS BY THE COURT

1.

Whether a written instrument is ambiguous is a question of law subject to de novo review.

2.

The cardinal rule of contract interpretation is to ascertain the parties' intent. If the contract is unambiguous, we determine the parties' intent by the language of the contract alone. But if a contract has ambiguous language, we may consider extrinsic evidence to construe it.

3.

When determining whether a provision in an insurance policy is ambiguous, courts consider what a reasonably prudent insured would understand the language to mean, not what the insurer intends the language to mean.

1

4.

The applicability of an insurance exclusionary clause is a question of fact. The insurer bears the burden of proving facts which would bring a case within the specified exception.

5.

When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact.

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed April 12, 2019. Affirmed.

*Matthew L. Bretz*, of Bretz & Young, L.L.C., of Hutchinson, for appellant.

*David S. Wooding* and *Anna C. Ritchie*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and BURGESS, S.J.

ARNOLD-BURGER, C.J.:  The cardinal rule of contract interpretation is to ascertain the parties' intent. If the contract is unambiguous, we determine the parties' intent by the language of the contract alone. But if a contract has ambiguous language, we may consider extrinsic evidence to construe it.

Zachary Short sued Blue Cross and Blue Shield of Kansas (BCBS) for breach of contract after BCBS refused to cover the full cost of a prosthetic leg called the Ottobock X3. The insurance policy provided that BCBS would cover the cost of a basic (standard) device and that it would not cover charges for deluxe or electrically operated devices beyond the extent allowed for a basic (standard) device. BCBS provided evidence that the

2

X3 was electrically operated and thus subject to the limitations in the insurance policy. The district court agreed and granted BCBS's motion for summary judgment.

Short appeals, arguing that the contract is ambiguous and should be construed in a way that would require BCBS to cover the full cost of the X3. He also asserts that he should have been permitted to conduct more extensive discovery and that he should have been allowed to present expert testimony. However, the language in the contract is not ambiguous and electrically operated prosthetics are clearly subject to the limitations. Because the contract was unambiguous, the district court did not err in refusing to allow Short to seek additional evidence through discovery or introduce extrinsic evidence in the form of expert testimony. The decision of the district court is affirmed.

FACTUAL AND PROCEDURAL HISTORY

Short was involved in a catastrophic farming accident in October 2014 which left him severely injured. Short's injuries required him to undergo a bilateral knee amputation, with his left leg amputated above the knee and his right leg below the knee.

At the time of the accident, Short was insured by Blue Cross Blue Shield of Kansas (BCBS). Short sent a pre-service request to BCBS requesting coverage for multiple prosthetics. One of the prosthetics was an Ottobock X3 Microprocessor leg and knee. The X3 costs about $145,000. BCBS declined to cover the full cost of the X3 based on its insurance contract. The relevant portion of the contract provided:

"Except as limited, the services listed below are covered:

. . . .

    b. Orthopedic and prosthetic devices, appliances and items when medically needed and not otherwise excluded herein. This includes items such as orthopedic braces, artificial limbs, artificial eyes, and auditory osseointegrated devices.

3

**Limitations:**

. . . .

(3) Benefits are limited to the amount normally available for a basic (standard) appliance which allows necessary function. Basic (standard) medical devices or appliances are those that provide the essential function required for the treatment or amelioration of the medical condition at a Medically Necessary level.

(4) Charges for deluxe or electrically operated orthotic or prosthetic appliances, devices or items are not covered, beyond the extent allowed for basic (standard) appliances. Deluxe describes medical devices or appliances that have enhancements that allow for additional convenience or use beyond that provided by a basic (standard) device or appliance."

The contract defines "medically necessary" as:

"a service required to diagnose or to treat an illness or injury. To be Medically Necessary, the service must: be performed or prescribed by a Doctor; be consistent with the diagnosis and treatment of Your condition; be in accordance with standards of good medical practice; not be for the convenience of the patient or his Doctor; and is provided in the most appropriate setting."

BCBS believed that a prosthetic device was medically necessary and thus covered by the insurance contract. However, BCBS considered the X3 to be a deluxe or electrically operated prosthetic appliance subject to the limitations provision in the contract. BCBS determined that a basic (standard) knee would cost $2,925.32. It informed Short that it would pay him that amount, and that Short would be responsible for the balance of the cost of the X3. Short disagreed, and he sued BCBS for breach of contract.

During discovery, Short made several inquiries that are now at issue on appeal. In Interrogatory Number 2, Short asked BCBS to "[s]tate all facts and identify all

4

documents you contend support [BCBS]'s refusal to pay the cost of the Ottobock X3 prosthetic knees . . . ." Short also made several requests for documents, including:

"1. All insurance claims and underwriting files pertaining to the subject matter of this lawsuit.

. . . .

"5. Copies of all correspondence to and from others concerning Plaintiff.

"6. Original or true and correct copies of any recorded statement taken of Plaintiff.

. . . .

"8. Original or true and correct copies of all medical records and reports pertaining in any way to Plaintiff.

. . . .

"10. Any utilization or medical reviews dealing with Plaintiff.

"11. All documents you intend to introduce as evidence at the time of trial."

BCBS objected to these requests based on their relevance and scope. BCBS argued that the issue in the case was whether the full cost of the X3 fell within the provisions of Short's insurance, and that the issue could "be determined by the contract language as a matter of law by the Court."

Short filed a motion to compel discovery responses. Short asserted that he was "entitled to know what facts and documents [BCBS] contends supports their denial." He asked the district court to require BCBS to "produce any facts or documents besides the contract upon which [BCBS] relies in denying to provide [Short] the Ottobock X3, if any exists besides the contract." BCBS objected to Short's motion to compel discovery responses. It maintained its argument that this was a straightforward case that the court could decide by the language within the four corners of the contract.

The district court denied Short's motion to compel, finding that the contract language was not ambiguous, deluxe or electrically operated devices were not covered,

5

and the requested discovery would not likely lead to any relevant information regarding the nature of the claim.

Later in the litigation, Short filed an expert witness disclosure. He named only one person—Dr. Todd Cowen. Dr. Cowen prepared a Catastrophic Life Care Plan for Short. An expert develops a Life Care Plan by "applying methodological, expert analysis to determine and quantify the current and future medical care requirements of an individual." Although his report is over 130 pages long, Dr. Cowen only briefly addressed the X3. He stated:

> "The Ottobock X3 is a standard prosthetic appliance frequently used for military and other amputees, which allows the essential function required for the treatment or amelioration of the medical condition at a minimal level. It will not return full function to the knee and is not for mere convenience but would allow Mr. Short to keep up with everyday activities such as showering or walking on unlevel ground. The X3 protective cover is lightweight and incredibly strong. Ability Dynamic's Rush Foot is made of a unique glass composite that has been proven not to break down in heavy use like carbon fiber. It is a specially-formulated composite fiber material that is nearly indestructible, highly flexible and only available on Ability Dynamic's Rush Foot prosthetic devices. It delivers one of the most realistic and responsive foot and ankle motions available on the market."

When Dr. Cowen assessed Short, Short was using a borrowed X3. Short reported feeling safe and stable with the device, especially while trying to work on his family farm.

BCBS moved to strike Dr. Cowen as an expert witness in the case. BCBS reiterated its argument that expert testimony was unnecessary because the court could decide the issue solely by the language of the contract. We find no evidence in the record that the district court ever ruled on the motion to strike.

BCBS ultimately moved for summary judgment. BCBS framed the issue as whether it "was correct in determining that it could not cover the balance of the cost for the Ottobock X3 Microprocessor Knee based on the language in the contract excluding coverage for charges for deluxe or electrically operated prosthetic devices." BCBS argued that the district court need only "examine the pertinent contract language, which it has already determined is not ambiguous, to make its decision." BCBS attached screenshots from Ottobock's website related to the X3. The website described the X3 as "[t]he world's most technologically advanced microprocessor prosthetic leg." The website advertises that the X3 has several sensors and a microprocessor which help the knee operate. It is activated by five different activity modes using a small remote. The X3 is also battery operated, with one charge lasting approximately five days.

The district court granted BCBS's motion for summary judgment. In its decision, the district court reiterated its prior holding that the relevant contract provision was not ambiguous. The court noted that the relevant provision "excludes coverage of cost beyond a basic (standard) device for 'deluxe' or 'electrically operated' prosthetics." The court "interpret[ed] this language to mean that a basic (standard) device cannot be a deluxe or electrically operated device." Because the X3 is a deluxe device and electrically operated, the court held that BCBS correctly determined that it was not covered by the insurance contract.

Short appealed.

ANALYSIS

*The district court did not err by finding that the insurance policy was unambiguous.*

The district court's rulings on Short's motion to compel discovery responses and its grant of summary judgment to BCBS rested on its holding that the relevant contract provisions were unambiguous. Short argues that this holding was erroneous.

Whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp*., 296 Kan. 943, 964, 298 P.3d 250 (2013).

Contract language "is ambiguous when the words used to express the meaning and intention of the parties are insufficient in a sense the contract may be understood to reach two or more possible meanings." *Wood v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799 (1967). Ambiguity does not arise until "application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties." 199 Kan. at 242. Several of these rules are relevant here. "A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if the intention is consistent with legal principles. . . . Reasonable rather than unreasonable interpretations are favored by the law." *Hollenbeck v. Household Bank*, 250 Kan. 747, Syl. ¶ 1, 829 P.2d 903 (1992). Additionally, "all pertinent provisions of an insurance policy must be considered together, rather than in isolation, and given effect." *Brumley v. Lee*, 265 Kan. 810, 813, 963 P.2d 1224 (1998). Finally, when determining whether a provision in an insurance policy is ambiguous, courts consider "what a reasonably prudent insured would understand the language to mean, not what the insurer intends the language to mean." 265 Kan. at 813.

8

Short's first argument is that the district court failed to consider the insurance policy as a whole. The insurance contract provides coverage for prosthetic devices in a section titled "**Other Covered Services**." Specifically, the contract states that it covers prosthetic devices "when medically needed and not otherwise excluded herein." Directly following this provision is a section titled "**Limitations**." This section provides that charges for deluxe or electrically operated prosthetics is not covered beyond the amount allowed for a basic (standard) device. The contract defines deluxe devices as devices "that have enhancements that allow for additional convenience or use beyond that provided by a basic (standard) device or appliance." Short argues that the district court erred by holding that the only relevant policy provisions are in the "**Other Covered Services**" portion in the contract. He asserts that the district court's interpretation of this section is inconsistent with the definition of "medically necessary" found elsewhere in the contract.

As Short notes, the district court ruled that the term "medically necessary" was not at issue in the action because BCBS agreed that a prosthetic was medically necessary. Short then argues: "While the parties do agree that *a* prosthetic is medically necessary, the issue that sits at the heart of this case is *what* prosthetic is medically necessary to treat or ameliorate [his] condition—the unidentified prosthetic that purportedly costs $2,925.32 or the X3?" Short asserts that to answer this question the district court needed to interpret the term "medically necessary."

Short's argument misses the point. The issue is not which device is medically necessary, as BCBS has already determined that both the X3 and a basic prosthetic are medically necessary. If the X3 was not medically necessary, then BCBS would not have offered to pay for a portion of its cost. The true issue in this case is determining how much BCBS must pay for a medically necessary prosthetic. If it is a basic or standard appliance, BCBS will pay the full cost. If it is a deluxe or electrically operated appliance, BCBS will pay the amount that a basic or standard appliance would cost. For these

9

reasons, the district court did not err in concluding that the term "medically necessary" was not at issue.

Short also uses the definition of "medically necessary" to argue that the district court's decision subverts the intention of the parties. He asserts that the contract displays a clear intention of the parties to obligate BCBS to pay for medically necessary treatments. Short contends that "[r]eading the '**Other Covered Services**' section as indiscriminately excluding coverage for electrically operated devices is a clear subversion of that intention." Short does not elaborate on this argument. However, excluding electrically operated prosthetic appliances does not necessarily subvert the parties' intentions because BCBS will still pay for standard prosthetics. Furthermore, electrically operated devices are not exactly excluded from coverage. Under the contract, BCBS must pay for electrically operated prosthetics if they are medically necessary, but the amount of that payment is limited to the amount that would have been allowed for a basic (standard) prosthetic.

Similarly, Short argues that "interpreting the relevant provision as furnishing coverage for devices that provide 'essential function' 'at a Medically Necessary Level,' but then excluding coverage wholesale for electrically operated devices, creates a conflicting and absurd result." He says it is "conceivable that an electrically operated device would meet the policy's definition of a 'basic (standard)' prosthetic without providing the additional convenience necessary to convert it into a 'deluxe' device." He concludes that "an electrically operated device can also be a basic one, addressing the insured's condition *only* at a medically necessary level." Short's argument is defeated by the terms of the contract. An electrically operated device can never be a basic device according to the contract. The contract limits coverage for electrically operated devices and deluxe devices. Just because an electrically operated device may not meet the definition of a deluxe device does not mean that it is a basic or standard device. This is not an absurd result. Presumably, BCBS researched the various prosthetic devices before drafting this

10

policy. It concluded that it was willing to cover the cost of a standard device, but not an electrically operated one. This is a reasonable business practice, and the district court's interpretation of the contract does not lead to an absurd result.

Finally, Short argues that the definitions for "basic (standard)" and "deluxe" devices in the policy are "so terse and skeletal as to raise more questions than answers." The contract provides that "[b]asic (standard) medical devices or appliances are those that provide the essential function required for the treatment or amelioration of the medical condition at a Medically Necessary level." The term "deluxe" means "medical devices or appliances that have enhancements that allow for additional convenience or use beyond that provided by a basic (standard) device or appliance." Short asks: "What constitutes 'essential function[ing]'? When do a device's enhancements provide 'additional convenience' beyond mere 'essential function'?" He asserts that the answers to these questions are not apparent from the four corners of the contract.

While the insurance policy does not identify the exact products that it covers, it does provide sufficient detail to support the district court's decision that the policy is not ambiguous. "Essential" means "absolutely necessary; indispensable; requisite." Webster's New World College Dictionary 497 (5th ed. 2014). As a result, the policy will cover a nonelectric device that provides only what is absolutely necessary to treat the insured's condition. If a device does more than what is necessary to treat the condition, it provides additional convenience, and coverage for such a device would be limited by the contract. Here, there is no dispute that the X3 is electrically operated so it is easy to apply the policy because it specifically excludes electrically operated devices.

As a final note, Short asks this court to apply one of two principles of construction. First is the doctrine of "reasonable expectations" and second is the "rule of liberal construction." See *Penalosa Co-op Exchange v. Farmland Mut. Ins. Co.*, 14 Kan. App. 2d 321, 324, 789 P.2d 1196 (1990) (describing the two doctrines). Short argues that

11

application of either doctrine shows that BCBS must provide coverage for the X3. But courts only utilize these doctrines when a contract is ambiguous. 14 Kan. App. 2d at 324; see also *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 923, 46 P.3d 1120 (2002) ("Unless there is a finding that an insurance policy is ambiguous, the reasonable expectations doctrine does *not* permit the court to reform the unambiguous meaning of the contract."). Because the BCBS insurance policy was not ambiguous, this court cannot apply these particular doctrines of construction.

Before ruling, the district court appropriately considered the insurance policy as a whole. The intentions of the parties are clear from the face of the document—BCBS agreed to cover the cost of basic prosthetics and contribute to the cost of deluxe or electrically operated prosthetics when medically necessary. The district court's interpretation of the policy did not lead to unreasonable results. Therefore, the district court did not err in holding that the insurance policy was unambiguous.

*BCBS properly set out exclusions in its policy.*

Next, Short argues that BCBS had to set out the limitations on deluxe or electrically operated devices in a separate policy provision specifically designated as "exclusions." He characterizes the limitations provision as following the paragraph bestowing coverage for basic prosthetics and being nestled between various definitions. Short contends that BCBS "cannot confer coverage for prosthetics, and then, in the same breath, rescind coverage for a significant portion of the prosthetics available on the market." Short claims that the way that BCBS drafted the contract "creates a strong likelihood that ordinary insureds such as Plaintiff will be broadsided and unfairly surprised by the insurer's denial of coverage."

Determining whether an insurance policy provides clear exclusions requires interpretation of a written insurance contract, which presents a question of law over

12

which this court exercises unlimited review. *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 709-10, 89 P.3d 573 (2004).

The Kansas Supreme Court discussed exclusions in insurance policies in *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 961 P.2d 1213 (1998). There, it stated:

"Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms. *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 695, 840 P.2d 456 (1992). If an insurer intends to restrict or limit coverage, it must use clear and unambiguous language in doing so, otherwise the insurance policy will be liberally construed in favor of the insured. *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 248 Kan. 657, 659, 810 P.2d 283 (1991). The burden is on the insurer to prove facts which bring a case within the specified exception. *Upland Mutual Insurance, Inc. v. Noel*, 214 Kan. 145, 150, 519 P.2d 737 (1974)." 265 Kan. at 327.

Short asserts that this case is analogous to *Ferguson v. Phoenix Assurance Co.*, 189 Kan. 459, 370 P.2d 379 (1962). There, Forrest Ferguson had a Storekeepers Burglary and Robbery Policy to insure money lost by safe burglary. Phoenix Assurance Company of New York issued the policy. Someone broke in to Ferguson's business and stole money out of his safe. The person opened the outer door of the safe by manipulating the combination lock. The inner door of the safe had marks of force on it, which evidenced the use of tools to gain access to the safe. The thief stole $433.76 from the safe. Yet Phoenix asserted that an exclusion in its policy limited the amount that Ferguson could recover to $50. Ferguson sued.

The policy at issue in *Ferguson* limited liability to $1,000 for each of seven "INSURING AGREEMENTS." 189 Kan. at 461. One of these events was "Burglary; Safe Burglary." 189 Kan. at 461. This section was "'[t]o pay for loss by safe burglary of

money, securities and merchandise within the premises and for loss, not exceeding $50, by burglary of money and securities within the premises.'" 189 Kan. at 461. After listing the seven insuring events, the policy had a section titled "EXCLUSIONS." 189 Kan. at 461. Then, the policy had a section titled "CONDITIONS." 189 Kan. at 461. It included a definitions section in the conditions section. The policy included the term "Safe Burglary" in the definitions section. It provided:

> "'"Safe Burglary" means (1) the felonious abstraction of insured property from within a vault or safe, the door of which is equipped with a combination lock, located within the premises by a person making felonious entry into such vault or such safe and any vault containing the safe, when all doors thereof are duly closed and locked by all combination locks thereon, provided such entry shall be made by actual force and violence, *of which force and violence there are visible marks made by tools, explosives, electricity or chemicals upon the exterior of (a) all of said doors of such vault or such safe and any vault containing the safe, if entry is made through such doors*, or (b) the top, bottom or walls of such vault or such safe and any vault containing the safe through which entry is made, if not made through such doors, or (2) the felonious abstraction of such safe from within the premises.'" 189 Kan. at 461.

Phoenix relied on the italicized language as evidence that it did not have to compensate Ferguson for the money lost in the safe. It argued that because "there were no visible marks of force and violence made by tools, explosives, electricity or chemicals upon the exterior of the outer door through which entry was made, the loss was not insured under the plain meaning of the policy." 189 Kan. at 462.

The Kansas Supreme Court disagreed. It began its analysis by noting that the provision is intended to protect the insurer from fraudulent claims arising from "'inside jobs.'" 189 Kan. at 464. The court interpreted the provision as "a rule of evidence upon the assured to establish that entry was made into the safe by actual force and violence." 189 Kan. at 469. The court held that insurance companies have the right to require proof

14

of evidentiary facts, but only when such a provision is not in contravention of public policy and not ambiguous. 189 Kan. at 470. Then, noting that the provision at issue in the case was "obviously designed to defeat recovery on a just claim," the court held that it violated public policy. 189 Kan. at 471. The court concluded by stating: "Had the insurance carrier desired to exclude loss by safe burglary where the combination of the outer door is worked by manipulation, such provision should have been incorporated under the 'EXCLUSIONS' in the policy." 189 Kan. at 471.

This case is distinguishable from *Ferguson*. There is no allegation here that the insurance contract contravenes public policy. Additionally, the language at issue in this case is a substantive provision in the contract, not a standard of evidence like in *Ferguson*. The primary distinction between the cases is that the limitations in BCBS's insurance contract are much clearer and more explicit than the insurance contract in *Ferguson*. The language which provided insurance coverage for safe burglaries in *Ferguson* did not mention that it was subject to limitations. In the current case, the language in the contract providing insurance coverage for prosthetic devices specifically states that the coverage may be limited by other parts of the contract. Directly after the provision granting coverage for prosthetics is a section called "**Limitations**," written in bold font. In *Ferguson*, the provision conveying coverage for safe burglaries was followed by a section called "EXCLUSIONS," but that section contained no relevant language. 189 Kan. at 461. The insured had to go to the next section of the contract— "CONDITIONS"—and read the definition of "Safe Burglary" to discover the limitations on recovery. 189 Kan. at 461. This is much farther removed from the original grant of coverage than in this case.

Finally, Short argues that BCBS "was apparently well-aware of its obligation to state its exclusions to coverage in clear and explicit terms, as its policy contains several conspicuously marked exclusion sections." While this is true, the policy also contains several conspicuously marked limitation sections. BCBS organized its contract so that a

section will begin by bestowing coverage and end by listing either exclusions or limitations on that coverage. For example, the insurance policy provides benefits for temporomandibular joint dysfunction (TMJ) syndrome. This includes several nonsurgical treatments. After the section that bestows coverage for nonsurgical treatments for TMJ, there is both a limitations and an exclusions section. The limitations section creates monetary and temporal limits on benefits. The insured is limited to $1,000 per course of treatment, and the insured may only receive benefits under the section every five years. The exclusions section lists nonsurgical treatments for TMJ that are never covered, such as vitamins or transcutaneous electrical nerve stimulators. It makes sense that the provision on deluxe or electrically operated prosthetics would be in a limitation section and not an exclusion section because such devices are not excluded from coverage. They are covered by the insurance policy, but recovery is limited to the amount that would have been available for a basic device. If deluxe prosthetics were excluded from the policy, then BCBS would not have offered Short $2,925.32. For these reasons, Short's argument is not persuasive.

A reasonable insured person could read the contract and understand that BCBS will pay for medically necessary prosthetics up to the amount that a basic (standard) prosthetic would cost. As a result, the BCBS insurance policy adequately sets out exclusions and limitations.

*The district court did not err in granting summary judgment.*

Short argues that even if the contract is unambiguous, the district court erred in granting summary judgment. Short makes two primary arguments: (1) BCBS did not offer facts sufficient to justify application of the limitation; and (2) this issue presented a question of fact ill-suited for summary disposition.

The standard of review in summary judgment appeals is well established:

16

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 (1999).

Short begins by noting that "[t]he applicability of an insurance exclusionary clause is a question of fact." *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 79, 350 P.3d 1071 (2015). The insurer bears the burden of proving facts which would bring a case within the specified exception. *Marquis*, 265 Kan. at 327.

Short's first argument is that BCBS provided no facts that justified application of the exclusion. Short argues that "[t]he medical necessity of the X3 for Plaintiff was a question for medical experts to address." Short notes that expert testimony can only be controverted by other expert testimony. See *City of Arkansas City v. Bruton*, 284 Kan. 815, Syl. ¶ 10, 166 P.3d 992 (2007) ("[T]he testimony of an expert witness on a subject calling for expert opinion is conclusive to the extent that it may not be contradicted by the testimony of a nonexpert witness."). Short concludes that Dr. Cowen's report conclusively showed the contract covers the X3, and BCBS failed to present its own expert to controvert Dr. Cowen's report.

The problem with Short's argument is that medical necessity is not at issue here. As stated above, BCBS agreed that the X3, a prosthetic device, was medically necessary. As a result, there was no reason to controvert Dr. Cowen's report. Dr. Cowen did not

17

opine on whether the X3 was a basic device, an electrically operated device, or a deluxe device.

BCBS provided evidence that the X3 was electrically operated by providing the court with screenshots from Ottobock's website. The website advertised the X3 as having sensors, a microprocessor, and a battery. From the website, it is clear that the X3 is electrically operated and thus subject to the limitations provision in the insurance policy. Short argues that the statements on Ottobock's "website are obviously promotional and intended to portray the X3 in the best possible light." He adds that companies "frequently embellish their products' features in an attempt to sell as many products as possible."

Short's accusation that Ottobock engages in unscrupulous advertising is insufficient to create a genuine issue of material fact that would preclude summary judgment. Short presented no evidence to dispute BCBS's assertion that the X3 was electrically operated. He also provided no evidence to support his claim that Ottobock lied on its website to sell more products. "When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact." *Bergstrom*, 266 Kan. at 871. Short failed to come forward with the evidence. Accordingly, it was appropriate for the district court to grant BCBS's motion for summary judgment.

*The district court abused its discretion when it denied Short's motion to compel, but the error was harmless.*

During discovery, Short asked BCBS to provide information explaining its decision to refuse to cover the full cost of the X3. He also asked for various documents related to his case like medical records and reports and correspondences to and from others about Short. BCBS objected to several of Short's questions based on relevance and scope. Short filed a motion to compel discovery responses, and the district court denied

it. Now on appeal, Short argues that the district court committed errors of law and fact, thus abusing its discretion, when it denied his motion to compel.

"The control of discovery in Kansas is entrusted to the sound discretion of the district court . . . and orders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion." *In re Tax Appeal of City of Wichita*, 277 Kan. 487, 513, 86 P.3d 513 (2004). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles*, 302 Kan. at 74.

Under K.S.A. 2016 Supp. 60-226(b), which defines the scope of discovery, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to the subject matter involved in the action." "[T]he scope of relevancy in a discovery proceeding is broader than the scope of relevancy at trial." *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 620, 244 P.3d 642 (2010). This is because "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." K.S.A. 2016 Supp. 60-226(b)(1); *Kansas Med. Mut. Ins. Co.*, 291 Kan. at 620.

Generally, "[w]hen the intent of the parties to a contract is clearly ascertainable by construing the document from its four corners it is not considered ambiguous; although some terms may be conflicting, extrinsic evidence is inadmissible and rules of construction applicable to ambiguous contracts do not apply." *Brown v. Lang*, 234 Kan. 610, 614-15, 675 P.2d 842 (1984). As already discussed, the insurance policy here is not ambiguous. If the evidence is limited to the contract, then discovery would not lead to any admissible evidence and the district court did not abuse its discretion in denying Short's motion to compel. But this case involves a limitations clause. As stated above, the application of a limitations clause in an insurance contract is a question of fact, and the insurer bears the burden of proving facts which would bring a case within the specified

19

exception. *Marquis*, 265 Kan. at 327. This meant that BCBS had to provide facts beyond what was available in the contract. BCBS did provide such facts in its motion for summary judgment, when it attached screenshots of the Ottobock website. BCBS did not provide the information from the Ottobock website to Short when he requested information explaining BCBS's decision to refuse to cover the full cost of the X3.

The district court premised its opinion on the idea that the only issue was one of contract interpretation, a matter of law for the court to decide without extrinsic evidence. But because BCBS needed to provide facts justifying its application of the limitations clause, the issue was not a purely legal one. The district court made an error of law when it denied Short the opportunity to discover the facts that BCBS used to justify application of the limitation.

Having found that the district court made an error of law, the next issue is determining whether the error was prejudicial. A trial error is not grounds for reversal unless the error affects a party's substantial rights. K.S.A. 2018 Supp. 60-261. "Among other things, this court specifically considers whether the error is of such a nature as to affect the outcome of the trial." *State v. Wells*, 289 Kan. 1219, 1233, 221 P.3d 561 (2009). Here, BCBS's failure to provide Short with the information from the website did not affect the outcome of the trial. Short did receive the screenshots from the Ottobock website when BCBS moved for summary judgment. Because Short used a loaner X3 during the case, the printouts describing the features of the X3 could not have surprised him. Short had an opportunity to contest this information, which would not have been hard as he had personal experience with the X3 and its features, in responding to BCBS's motion for summary judgment. Instead of proving that the X3 was not electrically operated, Short made a conclusory allegation that the Ottobock embellished products on its website. Short has never disputed that the X3 is electrically powered by battery. He would know if it was not electrically powered because he was using a loaner device for some time.

20

While it was error for the district court to bar Short from discovering the facts that BCBS relied on in denying coverage for the X3, the error was harmless. Short was aware throughout the litigation that BCBS considered the X3 a deluxe or electrically operated device, and thus subject to the limitation in the insurance policy. Short had an opportunity to contradict the evidence BCBS included in its motion for summary judgment, but he failed to do so. This error, therefore, does not require reversal.

Affirmed.

\* \* \*

ATCHESON, J., dissenting:  Based on the narrow issue Defendant Blue Cross and Blue Shield of Kansas presented in its motion for summary judgment and the limited factual support in the record, the Saline County District Court erred in holding as a matter of law that the insurance company properly refused to pay for an electronic prosthetic leg for Plaintiff Zachary Short. The contract language Blue Cross relied on to deny Short's request doesn't so obviously mean what the company says it means. And Blue Cross hasn't shown its denial fits within that language. I would reverse the summary judgment the district court entered for Blue Cross and remand the case for further proceedings. So I respectfully dissent from my colleagues' decision to affirm.

*Factual and Procedural Background*

The relevant underlying facts can be quickly outlined. Short had a medical insurance policy with Blue Cross when he suffered catastrophic injuries resulting in the amputation of both his legs. Short requested that Blue Cross pay for an Ottobock X3, an above-the-knee prosthetic leg. Blue Cross refused, claiming the Ottobock X3 fell within a policy limitation for certain prosthetic devices. Short sued Blue Cross for breach of

21

contract. Short's other leg was amputated below the knee, and this case does not concern benefits related to that injury.

The insurance contract covered the cost of "[o]rthopedic and prosthetic devices . . . includ[ing] . . . artificial limbs" subject to a pair of related limitations:

"(3)     Benefits are limited to the amount normally available for a basic (standard) appliance which allows necessary function. Basic (standard) medical devices or appliances are those that provide the essential function required for the treatment or amelioration of the medical condition at a Medically Necessary level.

"(4)     Charges for deluxe or electrically operated orthotic or prosthetic appliances, devices or items are not covered, beyond the extent allowed for basic (standard) appliances. Deluxe describes medical devices or appliances that have enhancements that allow for additional convenience or use beyond that provided by a basic (standard) device or appliance."

For summary judgment purposes, nobody disputes Blue Cross was contractually obligated to pay for a prosthetic leg for Short. After Short asked Blue Cross to cover the Ottobock X3, the company responded that it would pay $2,925.32 as "the allowed [contract] amount for the basic (standard) knee" without identifying a particular device. The Ottobock X3 costs far more than Blue Cross' allowed amount. The parties did not identify an amount in their statements of fact on summary judgment, but the supporting evidentiary materials indicate a cost of about $145,000. The parties do not dispute the Ottobock X3 uses a battery for certain functions and, therefore, is "electrically operated" within the meaning of that phrase in policy limitations.

The district court found the policy limitations to be unambiguous and applicable to the Ottobock X3 and, therefore, granted summary judgment to Blue Cross, limiting the company's contractual obligation to $2,925.32. Short has appealed.

22

*Summary Judgment for Blue Cross Improperly Granted*

The standards for granting summary judgment and their review on appeal are well known. A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment may, therefore, be entered in its favor as a matter of law. *Trear v. Chamberlain*, 308 Kan. 932, 935, 425 P.3d 297 (2018); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). In essence, the movant argues there is nothing for a jury or a trial judge sitting as fact-finder to decide that would make any difference. In ruling on a summary judgment request, the district court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Trear*, 308 Kan. at 935-36; *Shamberg*, 289 Kan. at 900.

An appellate court applies the same standards in reviewing the entry of a summary judgment. *Trear*, 308 Kan. at 936. Because summary judgment amounts to a question of law—it entails the application of legal principles to uncontroverted facts—an appellate court owes no deference to the district court's decision to grant the motion and review is unlimited. *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009); *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 460, 276 P.3d 773 (2012).

In the district court, Blue Cross argued the contract language is unambiguous and plainly limits coverage for "deluxe" and electrically operated prostheses to the cost of what is considered a "basic (standard)" prosthetic. And Blue Cross said the evidence submitted in support of the summary judgment shows the Ottobock X3 comes within either limitation. The district court agreed. Blue Cross essentially reprises those points on appeal. The majority opinion focuses on the exclusion for electrically operated devices in affirming the district court. But the opinion also seems to conclude the Ottobock X3 can

be excluded from coverage as a deluxe device. The contract language and the record evidence support neither conclusion.

A contract is unambiguous "if the language . . . is clear and can be carried out as written." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, Syl. ¶ 2, 829 P.2d 884 (1992). Conversely, an ambiguous contract "must contain provisions or language of doubtful or conflicting meaning." 250 Kan. 676, Syl. ¶ 2. Ambiguity arises if "the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992); *Antrim, Piper, Wenger, Inc. v. Lowe*, 37 Kan. App. 2d 932, 938, 159 P.3d 215 (2007). A contract, therefore, is not ambiguous simply because the parties disagree about its meaning. 37 Kan. App. 2d at 938. If a contract is unambiguous, it may be construed as a matter of law. See *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011); *Levin v. Maw Oil & Gas*, 290 Kan. 928, Syl. ¶ 2, 234 P.3d 805 (2010) ("The interpretation and legal effect of a written instrument are matters of law . . . .").

Insurance policies are to be strictly construed, and any ambiguities should be resolved against the insurer, here Blue Cross. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 707, 317 P.3d 70 (2014). The applicability of a policy limitation or exclusion to a claim reflects an avoidance or affirmative defense on which the insurer bears the ultimate burden of proof. *Evergreen Recycle v. Indiana Lumbermens Mut. Ins. Co.*, 51 Kan. App. 2d 459, 478, 350 P.3d 1091 (2015) (policy exclusion constitutes affirmative defense); *Golden*, 47 Kan. App. 2d 450, Syl. ¶ 20 (defendant carries burden of proof on affirmative defense). That means to prevail on summary judgment an insurance company must present uncontroverted evidence establishing that the limitation or exclusion applies. 47 Kan. App. 2d 450, Syl. ¶ 20.

Blue Cross contends the policy limitation categorically applies to any electrically operated prosthetic device and, thus, to the Ottobock X3. But the language doesn't say

that. The limitation simply says that Blue Cross does not have to pay for the cost of "electrically operated . . . prosthetic appliances . . . beyond the extent allowed for basic (standard) appliances." The policy describes "basic (standard) devices" as those providing "the essential function required for the treatment or amelioration of the medical condition." If an electrically operated prosthesis *is* a "basic (standard) device"—a term that itself is fraught with ambiguity—then Blue Cross has to pay for it. Blue Cross would not have to pay for the additional cost of a higher grade electronic device with more bells and whistles than the basic (standard) one.

A clear categorical limitation of the type Blue Cross wants wouldn't be difficult to draft. For example, in paragraph (4) of the limitations, Blue Cross could have deleted the phrase "electrically operated" from the first sentence, leaving "deluxe" as the sole descriptor, and revised the second sentence to say that "[d]eluxe describes *any electrically operated orthotic or prosthetic appliances or devices and those* medical devices or appliances that have enhancements . . . ." Or Blue Cross could have added something like this as a freestanding sentence in one of the limitation paragraphs:  "Any electrically operated orthotic or prosthetic appliance is not considered a basic (standard) appliance." Or this:  "Any electrically operated orthotic or prosthetic appliance is considered a deluxe appliance."

Measured against that sort of plainly articulated limitation, the actual policy language should be fairly read to cover electrically operated prosthetics that otherwise can be characterized as "basic (standard)" devices. At the very least, the language is ambiguous and open to that reading, meaning it should be strictly construed against Blue Cross to include those devices. That's especially true when we consider the point in weighing the company's summary judgment motion. By rejecting either of those interpretations and buying into Blue Cross' self-serving reading of the limitation, the district court and my colleagues mistakenly deviate from the rules governing summary judgment and interpretation of insurance contracts.

But my take on the policy language wouldn't require reversal if Blue Cross had shown that the Ottobock X3 cannot be considered a "basic (standard)" device or must be considered a "deluxe" device as a matter of law based on the evidence presented on summary judgment. Those really are congruent frames for the secondary argument Blue Cross advanced in its summary judgment papers and again on appeal. The argument, however, fails on this record.

First, as I have indicated, the term "basic (standard)" used in the policy to describe prostheses and other devices or appliances is ambiguous. The phrase effectively presents "basic" as equivalent to or synonymous with "standard," and that is incorrect. Words not otherwise specifically defined in a contract should be given their ordinary meaning. See *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, 550, 304 P.3d 1226 (2013). Thus, "basic" describes something "serving as the basis or starting point" as in "a [basic] set of tools." Merriam-Webster's Collegiate Dictionary 101 (11th ed. 2003). In that sense, "basic" connotes minimally acceptable for a particular purpose. By contrast, "standard" carries two potentially relevant meanings: "sound and usable but not of top quality" or "regularly and widely used." Merriam-Webster's Collegiate Dictionary 1216 (11th ed. 2003). The first meaning refers to a qualitative level that exceeds basic but falls short of, for example, deluxe. The second meaning refers to breadth of use and contrasts with limited or experimental. The Blue Cross policy presumably uses the word "standard" qualitatively, since it pairs with "basic," albeit in something of an oxymoron, and contrasts with "deluxe."

The phrase "basic (standard)" incorporates two qualitative levels—minimally acceptable and sound but less than the best. Applying the rule of strict construction of insurance contracts against the insurer, the phrase should be treated as referring to midrange quality unless the context obviously demands something else.

26

As defined in the policy, a "deluxe" prosthetic would be one that has "enhancements that allow for additional convenience or use" over and above "a basic (standard) device." In other words, a deluxe device would be better than a standard one. So Blue Cross would still be entitled to summary judgment if the record evidence indisputably shows the Ottobock X3 is better than a standard above-the-knee prosthetic leg. But the record doesn't establish that proposition as a matter of law.

The only uncontroverted fact Blue Cross offered on the point is a statement that the Ottobock X3 is "[t]he world's most technologically advanced prosthetic leg." Blue Cross identifies Ottobock's website as the source of the assertion. For summary judgment purposes, Short did not dispute the evidentiary foundation but characterized the statement as an "obviously promotional" advertisement of the device. But he cited no factual support for his characterization.

In opposing Blue Cross' motion, Short presented Dr. Todd Cowen's description of the Ottobock X3 leg as a "standard prosthetic appliance." Dr. Cowen, a medical doctor, prepared a lengthy life care plan for Short detailing his current and future medical treatment and related needs based on his injuries. In its reply, Blue Cross challenged Dr. Cowen's qualifications to make the statement but did not otherwise controvert that description of the Ottobock X3. Blue Cross argued Dr. Cowen's statement was irrelevant given the policy limitation for electrically operated devices. The district court neither ruled on Dr. Cowen's expertise nor specifically rejected his statement describing the Ottobock X3 as a standard prosthesis.[*]

[*]In its uncontroverted facts, Blue Cross also relied on Ottobock's website to show the prosthetic leg used a rechargeable battery, contained a microprocessor, and provided multiple "activity modes" that could be activated by a remote control. Those representations bear directly on the Ottobock X3 being electrically operated—an undisputed fact—rather than on its being standard or deluxe.

The dueling representations about the Ottobock X3 are more in the nature of factually unsupported opinions than they are facts. As such, they do little to inform the summary judgment determination. Ottobock's characterization of the prosthetic as the *most* technologically advanced has the look of puffing or an essentially unverifiable claim of superior quality that could not be legally enforced by a dissatisfied customer. See *Golden*, 47 Kan. App. 2d at 482 ("A seller's representations that goods are 'first rate' or 'the finest around' are examples of sales talk or puffing that would not create an express warranty."); see K.S.A. 84-2-313(2) ("seller's opinion or commendation of the goods does not create a warranty"). At most, the statement could (and may well) support an inference that the Ottobock X3 amounts to a deluxe prosthetic within the policy limitation. But granting summary judgment for Blue Cross based on the statement would require drawing an inference against Short as the nonmoving party, contrary to the governing standard of review. The error would be redoubled here, since Blue Cross has the obligation to present uncontroverted facts demonstrating a clear legal entitlement to the policy limitation.

If that were not enough, Dr. Cowen's representation about the Ottobock X3 at least arguably creates a disputed issue of material fact (or, more accurately, unsupported opinion) about the device. His representation that the Ottobock X3 is a "standard" prosthetic device could remove it from the policy limitation and may controvert Blue Cross' ostensible representation about its technological attributes. The representation, however, is ambiguous in its brevity. Dr. Cowen might well have been explaining that the Ottobock X3 is in common use and, thus, standard rather than experimental as opposed to being of middling quality or functionality. Without something more in the record explaining what Dr. Cowen meant, we would have to draw an inference against Short and for Blue Cross to disregard the statement for summary judgment purposes. Blue Cross didn't object to the representation from Dr. Cowen as vague and ambiguous or as an insufficiently supported opinion.

28

In sum, Blue Cross has failed to provide a sufficient factual basis to show that the Ottobock X3 is a nonstandard or deluxe prosthesis coming within the policy limitation as a matter of law. Could Blue Cross have done so? Maybe. Do I harbor doubts about whether Short will prevail on the merits? Indeed. But that is not the test I am supposed to use in reviewing a summary judgment. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 276, 261 P.3d 943 (2011) (In reviewing summary judgment granted a defendant, an appellate court gives the plaintiff the benefit of all factual disputes and every reasonable inference drawn from those facts and asks whether a reasonable jury *might* render a verdict for the plaintiff—not whether such a verdict is probable.); *Cine SK8, Inc. v. City of Henrietta*, 507 F.3d 778, 788 (2d Cir. 2007); *Wright v. Enhanced Recovery Company, LLC*, 227 F. Supp. 3d 1207, 1215 & n.36 (D. Kan. 2016); *Dreamland Villa Community Club, Inc. v. Raimey*, 224 Ariz. 42, 46, 226 P.3d 411 (Ariz. App. 2010) (summary judgment not substitute for trial, "even if the trial court determines that the moving party will likely prevail at trial"); *Community Hospitals of Indiana, Inc. v. Aspen Insurance UK Limited*, 113 N.E.3d 636, 641 (Ind. App. 2018) ("Summary judgment is not a summary trial, and it is not appropriate just because the non-movant appears unlikely to prevail at trial.").

Given the rules we are to apply and the factual record in front of us, the district court erred in granting summary judgment to Blue Cross. I would reverse and remand for further proceedings.

29